STATE OF CONNECTICUT *v.* MURRAY S. COLTON
(14309)

PETERS, C. J., BORDEN, BERDON, NORCOTT and SANTANIELLO, Js.

Argued January 12—decision released August 17, 1993

*Kenneth Rosenthal,* with whom, on the brief, were *Steven D. Ecker, Bonnie Patton, Christine Perra* and *Marie A. Casper,* for the appellant (defendant).

*Susan C. Marks,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *James G. Clark,* assistant state's attorney, for the appellee (state).

Norcott, J. After a jury trial, the defendant, Murray Colton, was convicted of the crime of murder in violation of General Statutes §§ 53a-54a and 53a-8.[1] The trial court sentenced the defendant to a term of imprisonment of fifty years. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).

The defendant claims on appeal that the trial court: (1) violated the defendant's constitutional right to confront witnesses by precluding him from admitting certain evidence showing motive and bias of the state's chief witness; (2) improperly permitted an unrepresentative viewing of the crime scene by the jury; (3) abused its discretion by making certain evidentiary rulings; (4) improperly instructed the jury on consciousness of guilt and reasonable doubt; (5) improperly denied the defendant's pretrial motions for discovery and production of exculpatory information regarding the identity of other persons having a motive to harm the victim, and improperly failed to sanction the state for untimely disclosure of such information; and (6) failed to follow proper procedures in denying the defendant's request for access to medical and psychiatric records of the state's chief witness. We agree with the defendant on the first issue and, on that basis, we reverse the judgment of the trial court and remand the case for a new trial.

On January 13, 1987, the body of the victim, Patricia Konesky, was discovered in the third base dugout of

---

[1] General Statutes § 53a-54a provides in pertinent part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

General Statutes § 53a-8 provides in pertinent part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

the Kimberly Avenue baseball field in New Haven. The victim had suffered severe blunt trauma to the head and had been stabbed approximately 248 times in the face, neck and chest. The exact time of the victim's death could not be established, but she had last been seen alive on the night of January 12, 1987.

At the time of her death, the victim was a drug addict, who lived on the streets and operated as an informant for the New Haven police department. According to the testimony of one of the victim's police contacts, the victim had been providing information on narcotics activities in the Kimberly Avenue and Hill sections of New Haven for approximately nine months prior to her death. At least fifteen people, including the defendant's father, had been arrested and prosecuted as a result of that information.

The police investigation in the months following the victim's death never culminated in an arrest. The crime remained unsolved for more than one year. On February 5, 1988, the state posted notices in the Kimberly Square neighborhood offering a $20,000 reward for information leading to the arrest and conviction of the person or persons responsible for the victim's murder. Several weeks later, while at the New Haven police station under arrest for prostitution, Janice Tourangeau, who had previously given a statement relating to the victim's murder to the police in January, 1987, stated for the first time that she had been at the scene of the crime at the time of the victim's murder.

Tourangeau's statement to the police placed the defendant with the victim at the scene of the crime and implicated him, together with another individual who was never located, in the murder. At that time, Tourangeau expressed no interest in receiving the reward money. On the basis of this information, the police revitalized the investigation and focused on the defend-

ant, who had never been considered a suspect in the initial investigation in 1987. In June, 1988, the defendant was arrested and charged with the victim's murder. The state's theory was that the defendant had killed the victim in retaliation for the victim's informing the police of alleged narcotics activity of the defendant's father, which had led to his father's arrest and conviction.[2]

The defendant's first two trials, conducted in 1989 and 1990, resulted in hung juries. After a third jury trial conducted in 1991, the defendant was convicted of murder and was sentenced to fifty years in prison. Shortly thereafter, Tourangeau collected $14,000 from the state, which represented her share of the reward. Further facts will be discussed as they become relevant.

I

The defendant first claims that the trial court violated his right to confront witnesses and to present a defense under the sixth and fourteenth amendments to the United States constitution by precluding the admission of certain evidence tending to show the motive, bias or interest of Tourangeau, the state's chief witness. The defendant claims that the exclusion of this motive evidence in a case in which the credibility of Tourangeau was a critical issue was harmful and warrants a new trial. We agree.

At trial, Tourangeau gave the following account of her activities on the night of the victim's murder. On the night of January 12, 1987, Tourangeau had been dropped off on Kimberly Avenue by her friend, Cathleen Jones. Tourangeau was looking for the victim because she wanted the victim to obtain drugs for her.

---

[2] This theory was supported by the fact that several dimes were found on the bench of the dugout near the victim's body. In street parlance, informing against someone is known as "dropping a dime."

Tourangeau found the victim at Don Phillips Cafe, a bar owned by the defendant's father. The victim agreed to take drugs with Tourangeau, but told Tourangeau that Tourangeau would have to wait because she had something to do first.

The victim told Tourangeau that she had to meet someone on Kimberly Avenue and, after Tourangeau persisted in asking to go along, the victim agreed that Tourangeau could accompany her as long as she remained unseen. The two separated briefly and were to meet on Kimberly Avenue near Saint Peter's Church. Tourangeau arrived at the church and, shortly thereafter, saw the victim on the corner of Kimberly Avenue and Second Street. Tourangeau approached the victim and asked if she had the drugs yet. The victim responded that she had to go to Saint Peter's Street and reminded Tourangeau to remain out of sight. The victim and Tourangeau took separate routes to Saint Peter's Street. Tourangeau walked down Kimberly Avenue to a path that led to the baseball field, which was located at the end of Saint Peter's Street. She walked several steps out from the path onto the field when she saw the victim standing with the defendant by a manhole cover. Tourangeau backed up to some bushes at the edge of the field to stay out of sight, and observed the victim and the defendant walk to the third base dugout and sit on the dugout bench. At this point Tourangeau was positioned approximately 190 feet from the third base dugout.

Tourangeau observed the defendant suddenly stand up and pull the victim by her hair. Tourangeau then saw another man come from the side of the dugout and hit the victim on the side of the head. She described this man as having dark hair and a mustache, wearing tan boots and probably being Hispanic because he had dark skin. On cross-examination Tourangeau testified that when the victim had been struck she had seen

something squirt out of the victim's head and had heard a "squishing sound." As a result of this blow, the victim was knocked forward facing the ground. Tourangeau then saw both the defendant and the second man kick the victim.

At this point Tourangeau ran from the area. The second man noticed Tourangeau and yelled after her. Tourangeau kept running and sensed someone running behind her. She ran out onto Kimberly Avenue where she flagged down a car and jumped in. The driver of the car drove Tourangeau to her home. Tourangeau claimed that she then went into the bathroom and lay down in the bathtub until dawn, "put[ting] it together."

Tourangeau did not learn that the victim had been killed until she watched the evening news on television later that day. During both the 6 p.m. and the 11 p.m. news broadcasts reporting the discovery of the victim's body, Tourangeau stated to her companions, "That's Patty," although neither broadcast had mentioned the name of the victim.[3] Tourangeau covered up for knowing the identity of the person on the news by saying that she had recognized the victim's boots. She never told anyone about her presence at the field the night before because she was afraid of retaliation and of being known as a snitch on the street and therefore being unable to get drugs. When Tourangeau was interviewed by the police one week later, she did not mention what she had seen, and provided no information about the murder until March, 1988.[4]

---

[3] When the 6 p.m. news came on, Tourangeau testified that she had been at home with her friend, Cathy Jones, her roommate, Vivian Wiles, and her roommate's friend, Sandy Brown. Tourangeau testified that she had heard a second broadcast later that night at the Tremont Hotel with Jones and two other friends, Jacqueline Boyles and a drug dealer who went by the name of Cowboy.

[4] Tourangeau's second statement to the police came about in the following manner. Tourangeau testified that on March 29, 1988, she had been in the Kimberly Avenue neighborhood when she saw the defendant's truck

The defendant denied any involvement in the murder. He admitted in 1987, and again after his arrest in 1988, that he had seen the victim at his father's bar on the night before her body was discovered.[5] He testified that he had gone to a concert on the night of January 12, 1987, and had arrived home at approximately 10:30 p.m. The defendant testified further that he had spoken to the victim in his father's bar, and that his last contact with her had been on the street outside the bar. The defendant testified that, after the bar closed around 12 a.m., he had asked his father if he could borrow his father's car to see his girlfriend. Concerned that the defendant was too drunk to drive, his father had driven him to his girlfriend's house, had convinced him not to go to the door because of the lateness of the hour, and had then driven him home. The defendant testified that, once home, he had passed out in front of the television.[6]

The state conceded at trial that in order to convict the defendant of murder, the jury would have to credit

outside of his father's bar. Tourangeau testified that seeing the truck had brought back the memories of the night of the murder that she had been trying to suppress since then. Later that evening, Tourangeau was arrested for prostitution and was taken to the New Haven police station. Officer Paul Welch, who had known Tourangeau since childhood from the neighborhood, was on duty processing incoming prisoners when Tourangeau was brought to the cellblock. Welch testified that, while he was fingerprinting Tourangeau, Tourangeau became very upset and started to cry. She said that she couldn't "live with this any longer," and that she had to talk to someone. Welch then turned Tourangeau over to a detective for questioning. Tourangeau then gave a statement regarding what she had seen the night of the murder to then Detective Francisco Ortiz.

[5] The defendant lived in a building owned by his father. His father operated a bar on the ground level and the other floors served as the family's residence.

[6] The defendant's father testified also that after he had closed the bar, he had driven the defendant to his girlfriend's house and then home. He testified that after he had dropped the defendant off at home, he had gone to Dunkin Donuts, and that when he returned home the defendant was passed out on the floor.

the testimony of Tourangeau.[7] The credibility of Tourangeau's account of the night of the murder, including her reasons for coming forward some fourteen months later, was therefore a critical issue at trial.[8] On direct examination, Tourangeau testified that, before she had spoken to the police, she had been aware of the $20,000 reward offer from posters that had been placed around the neighborhood. She also testified that she initially had believed that she was not eligible for the reward because she thought that it was for the victim's family. The first time she had become aware that she might be eligible for the reward, Tourangeau testified, was when she had given her statement to the detectives.[9]

Tourangeau also testified on direct examination that, at the time of the murder, she had been addicted to heroin. She described her lifestyle at that time as a street life in which her principal interests were surviving and getting drugs, and explained that one of the reasons she had not come forward sooner had been the difficulty she would have had obtaining drugs if she had become known as a snitch. Tourangeau testified that prostitution was how she had made money at that time, and that she would spend all of her earnings on drugs. Tourangeau further testified that at the present time she was no longer addicted to drugs or engaged in prostitution. She stated that she had managed to overcome her addiction while in jail in 1989.

---

[7] During closing argument, the prosecutor argued: "You have to believe, substantially, you have to believe Janice Tourangeau in order to convict Murray Colton. No question about that. And that's where credibility comes in, which is what you all have to do and I'm sure what you've been doing in your own minds—and now can do collectively—throughout this trial."

[8] Tourangeau had also testified at the defendant's first two trials.

[9] Ortiz testified that the reward offer had always been for $20,000 and that he had not discussed, and was not aware that anyone else in the police department had discussed, the reward with Tourangeau. In a statement made to the state police, Tourangeau indicated that she thought the reward initially had been $10,000 and that it was later increased to $20,000.

When questioned about her desire for the reward money, Tourangeau testified that when she had first come forward she had had no interest in the reward. She maintained, both in her statement to the police and at trial, that the sole motivating factor in deciding to reveal what she had seen was the emotional anguish she experienced from "keeping it in." She also testified that she had become interested in the reward only as "soon as my life started to change." When asked to describe this change, Tourangeau testified: "I've gained part of a family back. I'm not a drug user. I need a new life. . . . I need to start my family and myself on a new life."

On cross-examination, defense counsel pursued at length Tourangeau's reasons for coming forward. He elicited from Tourangeau that her drug addiction required as much money as she could obtain, although she denied that she had come forward to get the reward to support her drug habit. Tourangeau stated that she had worked as a prostitute to support her drug habit, and that, during the time she used drugs, she "was prepared to engage in an act of prostitution any night." Tourangeau testified that she had needed money in 1986, 1987 and 1988 because those were her "addiction years," but that since June, 1989, she had overcome her addiction and "had a different lifestyle looking at me" so she did not need the money.[10]

Tourangeau stated that she had come forward because of the guilt she felt for not having done anything to save the victim, and claimed that the events of that night had weighed on her mind so much that she had sought professional counseling.[11] She testified

[10] At a later point in the cross-examination, however, Tourangeau also testified that she had a greater need for money at the time of the third trial than she had had when she first testified because she was no longer engaging in prostitution and was not otherwise employed.

[11] On continued questioning, however, defense counsel elicited that, although Tourangeau had gone to the Connecticut Mental Health Center

that she had not initially intended to claim the reward, but that she had decided to claim it after the first trial because of what it had done to her personal and social life, particularly the embarrassment it had caused her former husband and her children. She stated that the money would "take me and my kids away from here and just begin again."

Defense counsel repeatedly questioned Tourangeau regarding her assertion that she no longer was a drug user or engaged in prostitution after October, 1989. He elicited that Tourangeau had been arrested in connection with the possession of heroin in the summer of 1990, but Tourangeau testified that she had purchased the heroin for a friend who did not know where to get it. Tourangeau insisted that she had not used drugs since she was released from jail in October, 1989, and explained: "[T]here comes a time in everybody's life when they get too old to play them games on the street and they think a little differently and they want a few more things in life." Tourangeau also testified that, although she was not employed, she was not concerned about money because she had been given financial assistance since she stopped using drugs by either her former husband or her boyfriend, Dennis Maluk.

The defendant's claim is that the trial court improperly excluded evidence that would have contradicted Tourangeau's testimony regarding her new lifestyle and her motivation for coming forward, thus depriving the jury of the opportunity accurately to assess her credibility. This claim challenges several evidentiary rulings of the trial court that can be grouped into three categories. First, the defendant sought to introduce evidence that Tourangeau's assertion that she was no longer addicted to drugs and no longer engaging in

---

as an outpatient, she had never told anyone there what she had witnessed in connection with the victim's murder.

prostitution was patently false. During cross-examination of Tourangeau, the defendant asked Tourangeau whether she knew Michael Brown. Upon the state's request, the jury was then excused and the defendant presented an offer of proof. His counsel stated that Brown was a personal acquaintance of Tourangeau who would testify that he and Tourangeau had taken drugs together numerous times throughout 1990, including during the defendant's second trial, and that Tourangeau had continued to engage in prostitution throughout 1990. Defense counsel argued that he should be permitted to question Tourangeau about these subjects before he called Brown as a witness.[12]

The state argued that defense counsel should be permitted to ask the questions of Tourangeau, but that he would be "stuck" with her answers. Because Tourangeau's drug use or prostitution was a collateral matter, the state argued, the defendant should not be permitted to introduce extrinsic evidence of such behavior on the part of Tourangeau to contradict her testimony. The defendant argued that the proffered evidence went directly to Tourangeau's motive for testifying, which was not a collateral issue, and therefore extrinsic evidence to contradict her was admissible.

The trial court ruled that Tourangeau's alleged drug use and prostitution at a time when she claimed to have had no longer engaged in those activities were collateral matters. The court explained as to these matters: "Now, Mr. Rosenthal, that doesn't mean you cannot ask the witness the questions to see what her answer is. All it means is if her answer is in the negative you cannot bring in extrinsic evidence on that, those pre-

---

[12] Defense counsel argued: "I assume based on [Tourangeau's] prior track record that she's going to deny, maybe she'll deny that she even knows the man, but I have to ask the questions. She may deny these statements were made. I have to ask the questions in order to lay the foundation to bring in Michael Brown."

cise questions, but I think you've got a right to ask the witness the questions to at least find out what her answer is. . . . Depending on the answer, if it's in the negative, you're going to be stuck with that answer."[13]

The trial court adhered to this decision whenever the defendant attempted to admit evidence of drug use and prostitution by Tourangeau after 1989, the year in which she claimed to have overcome her addiction. During the defense case, an offer of proof was made in which Brown testified that he had known Tourangeau for fifteen years, that he had seen her four or five times a week during 1990,[14] that Tourangeau had ingested narcotics with him almost daily in 1990, that they had used drugs together during the defendant's second trial before Tourangeau would go to court, and that he had given Tourangeau rides to places where she would prostitute herself in 1990. Again the trial court ruled that this evidence did not bear sufficiently on the motive or bias of Tourangeau and was therefore inadmissible.[15]

---

[13] Because of the trial court's ruling, defense counsel declined to question Tourangeau on cross-examination regarding her drug use with Brown and engaging in prostitution in 1990.

[14] Brown's contact with Tourangeau ceased in late December, 1990, when Brown was imprisoned for an unrelated offense.

[15] With respect to how this evidence bore on the motive or bias of Tourangeau, the defendant argued: "It's information we claim the jury should have that as recently as December of 1990 she, contrary to her testimony, was a person who was still involved with narcotics with all the expenses that entailed, was a person who was so in need of money arguably to support that habit, if not to support other things as well, that she was prepared then as before to prostitute her body to get money, and that, contrary to her testimony she is a person who continues to have an incentive to testify in this case falsely in order to collect a reward so she can make $20,000 by sitting on a witness stand talking rather than prostituting to support a drug habit. The jury can infer, it seems to me, based on the recency of these events that she still has that need . . . that she was taking narcotics on this kind of a basis and this kind of a level through December of 1990 is every reason for the jury to at least consider that her motivations are not as pure as she wants them to believe."

Additionally, and also on the basis that Tourangeau's drug use and prostitution were collateral matters, the trial court did not admit the testimony of Jacqueline Boyles, a close acquaintance of Tourangeau. In an offer of proof during the defense case, Boyles testified that several weeks before this third trial commenced, she had witnessed Tourangeau at a McDonald's restaurant in Milford climbing in and out of trucks in a manner consistent with the practice of prostitutes at that location. Boyles also testified that Tourangeau had previously engaged in prostitution at that location. The trial court also did not admit a police report evidencing acts suggestive of prostitution in October, 1990, again on the basis that extrinsic evidence would not be allowed on a collateral matter.

The second category of evidence that the defendant sought to introduce in order to contradict aspects of Tourangeau's testimony was evidence that Tourangeau had suffered from severe depression and had had emotional problems that predated the victim's murder. Throughout her direct and cross-examination, Tourangeau maintained that she had been motivated to come forward solely by the mental burden of concealing what she knew, and not because of the reward money. The defendant sought to contradict this claimed motivation for coming forward by introducing evidence of a long history Tourangeau had had of depression and emotional problems that had nothing to do with the victim's murder.

In this regard, the defendant, in an offer of proof during recross-examination, elicited from Tourangeau that she had experienced severe depression and suicidal tendencies that had led to a hospital admission in August, 1986, five months before the victim's murder. The defendant also offered to prove that Tourangeau's problems of drug addiction, money difficulties and chronic depression were reflected in a September, 1987

hospital admission and a January, 1988 admission to the Connecticut Mental Health Center. The defendant argued to the court that the jury could not properly evaluate Tourangeau's testimony that she came forward because she was emotionally wrought, needed to feel better and needed professional counseling without also hearing that Tourangeau had struggled with depression for a good part of her life for reasons unrelated to the murder. The trial court did not admit this evidence because it was irrelevant and outside the scope of redirect examination.

Also, on cross-examination of Officer Paul Welch, who had processed Tourangeau's arrest on the night she gave the police her statement about the murder and who had testified that Tourangeau had been very emotional that night, the defendant was precluded from eliciting that Welch had had no knowledge of Tourangeau's history of emotional problems.[16] The trial court also precluded this testimony on the ground that it was irrelevant.

Finally, the defendant sought to introduce evidence to refute Tourangeau's testimony that, despite the fact that she was not employed, money was not a motivating consideration for her because she received whatever amounts she needed from either her former husband or Maluk.[17] In an offer of proof through Boyles, who had lived with Tourangeau for a period of time in 1987 and was familiar with Tourangeau's relationship with her former husband, the defendant elicited that Tourangeau had been beaten by her former husband for prostituting herself and that she lived in

---

[16] Defense counsel demonstrated this lack of knowledge on the part of Welch in an offer of proof outside the presence of the jury.

[17] The evidence relating to Tourangeau's former husband was also offered to contradict her testimony that her decision to apply for the reward had been partially due to a desire to make up for the embarrassment the trials had caused her former husband.

fear of him. The defendant argued that the relationship between Tourangeau and the sources of her financial support was relevant to the question of whether she in fact had such support and therefore was not motivated by money to testify. The trial court ruled that this evidence was irrelevant, despite the defendant's claim of relevance to Tourangeau's motive for testifying.

The defendant elicited from Tourangeau on cross-examination that she and Maluk had had a disagreement while they were living together that resulted in Maluk's calling the police. The defendant also elicited that Tourangeau had called the police several times because of arguments she had had with her former husband. During the defense case, the defendant offered into evidence several police reports: one indicating that Maluk had called the police to report that Tourangeau had threatened to hurt herself and blame it on him; and others indicating repeated conflicts between Tourangeau and her former husband. The defendant argued that these reports brought into question Tourangeau's claimed lack of concern for money and her alleged motivation for now claiming the reward, and thus were probative of her motive, bias or interest. The defendant also argued that the report concerning Maluk indicated a pattern by Tourangeau of falsely accusing someone when it suited her needs. The trial court sustained the state's objections to the admission of this evidence, stating that these issues were collateral, that the proffered evidence was cumulative and of only slight probative value, and that the defendant's constitutional right to attack Tourangeau's credibility had been adequately protected.[18]

---

[18] The defendant also offered the medical reports indicating Tourangeau's problems with depression and suicidal tendencies in this offer of proof. The trial court excluded these reports as well for the same reasons.

The defendant argues on appeal that these rulings of the trial court precluded him from exposing to the jury evidence that contradicted Tourangeau's claimed motive for testifying, and thereby violated his rights to confrontation and to present a defense under the sixth and fourteenth amendments to the United States constitution. He contends that the trial court improperly concluded that the issues of Tourangeau's drug use, prostitution, psychiatric history, and relationships with her husband and Maluk were collateral, and that extrinsic evidence probative of these issues was therefore inadmissible.[19] The defendant argues that these rulings required him to be "stuck" with Tourangeau's answers on issues relating to her motive, bias and interest, a matter that is never collateral and for which the introduction of extrinsic evidence is allowed. The exclusion of this evidence, in a case that turned on the credibility of this witness, the defendant argues, amounted to reversible error. We agree.

Ordinarily, extrinsic evidence of prior inconsistent statements cannot be used to contradict the testimony of a witness, and this rule is strictly observed when the witness' testimony relates to a collateral matter. *State v. Burns,* 173 Conn. 317, 327, 377 A.2d 1082 (1977). "A witness may not be impeached by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the

---

[19] We note that the defendant's claim, as it pertains to his offer of proof on recross-examination that Tourangeau would testify that she had been hospitalized in 1986 for severe depression and suicidal tendencies, was not that extrinsic evidence as to Tourangeau's motivation was admissible. As explained infra, we conclude that this evidence was not evidence of motive, bias and interest, and that it was within the trial court's discretion to determine its admissibility. We will overturn the trial court's ruling only on a finding of abuse of discretion. *State v. Boles,* 223 Conn. 535, 549, 613 A.2d 770 (1992). On this record, we cannot conclude that the trial court abused its discretion by determining that this testimony was irrelevant and outside the scope of redirect examination.

merits of the case. [Id.]; *State* v. *Carbone,* 172 Conn. 242, 262, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *State* v. *Wilson,* 158 Conn. 321, 324, 260 A.2d 571 (1969)." *State* v. *Negron,* 221 Conn. 315, 327–28, 603 A.2d 1138 (1992). Thus, "the answer of the witness on cross-examination to a collateral matter is conclusive and cannot be later contradicted." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.24.4.

Extrinsic evidence may be admitted, however, if the subject matter of the testimony is not collateral, that is, if it is relevant to a material issue in the case apart from its tendency to contradict the witness. *State* v. *Burns,* supra, 327; see also 1 C. McCormick, Evidence (4th Ed. 1992) § 49. Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. " ' "It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]. *Barnard* v. *United States,* 342 F.2d 309, 317 (9th Cir. 1965)." ' " *State* v. *Milum,* 197 Conn. 602, 610, 500 A.2d 555 (1985); see also *Davis* v. *Alaska,* 415 U.S. 308, 316–17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); 1 C. McCormick, supra, § 39, p. 136.

The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination, generally rests within the sound discretion of the trial court. *State* v. *Miller,* 202 Conn. 463, 482, 522 A.2d 249 (1987); *State* v. *Ontra,* 178 Conn. 480, 488, 423 A.2d 134 (1979); *Todd* v. *Bradley,* 99 Conn. 307, 323–24, 122 A. 68 (1923). This discretion arises, however, only after the defendant has been permitted cross-examination and impeachment of a witness sufficient to satisfy the sixth amendment. *State* v. *Vitale,* 197 Conn. 396, 402, 497 A.2d 956 (1985); *State* v. *Gaynor,* 182 Conn. 501, 508, 438 A.2d 749 (1980).

" 'The sixth amendment to the [United States] constitution guarantees the right of an accused in a crimi-

nal prosecution "to confront the witnesses against him." ' " *State* v. *Milum,* supra, 608–609. "The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy,* 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky,* 195 Conn. 475, 481–82, 488 A.2d 1239 (1985)." (Internal quotation marks omitted.) *State* v. *Santiago,* 224 Conn. 325, 331, 618 A.2d 32 (1992).

Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. *State* v. *Shipman,* 195 Conn. 160, 163, 486 A.2d 1130 (1985); 1 C. McCormick, supra, § 33, p. 112. The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest; "proof of the main facts is a matter of right but the extent of the proof of details lies in the court's discretion." *State* v. *Shipman,* supra; see also *State* v. *Lewis,* 220 Conn. 602, 622, 600 A.2d 1330 (1991). The right of confrontation is preserved if defense counsel is permitted to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra, 318.

Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. See *State* v. *Santiago,* supra, 331–32; *State* v. *James,* 211

Conn. 5,55, 573, 560 A.2d 426 (1989). The relevant inquiry, therefore, is whether the trial court's rulings excluding evidence of Tourangeau's drug use, prostitution, psychiatric history and relationships with her husband and Maluk resulted in the exclusion of extrinsic evidence that so significantly bore on the motive, bias and interest of Tourangeau that the exclusion infringed on the defendant's confrontation rights. It bears emphasis that any limitation on the impeachment of a key government witness is subject to the most rigorous appellate review. *State* v. *Gaynor,* supra, 509 n.7.

The motivation of Tourangeau in testifying was of paramount importance. In assessing her credibility, the jury had to inquire into the circumstances that led to her becoming a state's witness, the reasons for her long delay before coming forward and, most importantly, what role, if any, the reward money played in prompting her statements to the police a short while after the reward had been offered. According to Tourangeau's testimony, her mental and emotional anguish over keeping what she knew to herself, rather than any interest in the reward money, had motivated her to come forward. Also, according to Tourangeau, her drug-abusing lifestyle at the time of the murder, and the effect that giving information to the police would have on that lifestyle, was a powerful influence in her decision not to come forward initially. Tourangeau claimed that, by the time of the third trial, she had left her negative lifestyle behind, and now intended to collect the reward only to assist her and her family in making a new start.

Inquiry into the possible financial stake of a witness in the outcome of a case in which the witness is testifying is a proper subject of impeachment. *Wheeler* v. *United States,* 351 F.2d 946, 947 (1st Cir. 1965). Although Tourangeau's testimony as to her intent to collect the reward exposed this financial stake to the

jury, it was also relevant to her motive for the jury to know the circumstances under which, and for what purpose, she desired to collect the reward. The testimony of Brown and Boyles, and police reports indicating drug abuse and prostitution in 1990, strongly indicated the continuation of the same old lifestyle that supposedly had prompted Tourangeau to keep quiet in the first place and that potentially suggested a more compelling need for money than her new lifestyle commanded.

Had this evidence been admitted, the jury might well have inferred that Tourangeau's testimony was motivated by an expensive drug habit, for which she prostituted herself to support, and that the existence of the reward presented her with a means of supporting that habit, thereby alleviating temporarily the necessity to engage in prostitution. Without this additional evidence, Tourangeau's insistent testimony that her old lifestyle had been left behind, after what appeared to be an exhaustive cross-examination, not only deprived the jury of exposure to facts from which it could assess the motivation of the witness in testifying, but also led to the appearance that defense counsel was engaged in a speculative and baseless line of attack on the motivation of an otherwise blameless witness. *Davis* v. *Alaska,* supra, 318.

Had the jury credited the testimony of Brown and Boyles, not only would the evidence of Tourangeau's continued drug use and prostitution have indicated a continuous need for large sums of money and a lifestyle dominated by the need to survive and to do what is necessary to survive,[20] thus implying a stronger motive

---

[20] Indeed, Tourangeau had testified on cross-examination that the same day she had given a statement to the police in March, 1988, regarding the murder, she had been arrested for prostitution. Rather than give her name, Tourangeau testified that she had identified herself to the police as Cathy

for the reward money, but it would also have exposed the jury to a lie that had been repeated a multitude of times by Tourangeau at trial, raising a considerable question as to whether any of her testimony should be credited.

We conclude, therefore, that the matters the defendant sought to probe by the defendant's proffered evidence of continued drug abuse and prostitution were clearly relevant to Tourangeau's motive for testifying. Although it is within the trial court's discretion to limit the admission of cumulative evidence, even if that evidence is probative of motive, bias and interest, the trial court's rulings precluded the defendant from offering a constitutionally sufficient minimum of evidence to contradict Tourangeau as to her new lifestyle and hence her need for the reward. This evidence would have made available to the jury significant information to aid it in assessing the bias, motive and interest of Tourangeau for testifying as she did. The trial court improperly excluded this evidence on the ground that Tourangeau's drug use and prostitution were collateral matters, and thus failed to allow the defendant sufficient impeachment of Tourangeau to satisfy the requirements of the constitution.

We do not conclude, however, that the exclusion of evidence relating to Tourangeau's depression and emotional problems and to her relationships with both her husband and Maluk, except to the extent that they fur-

Jones, but that she had later been caught in the lie because one of the officers at the station had recognized her.

Tourangeau had also testified as to what it was like to be out looking for drugs, which she referred to as a "mission." She testified: "A mission is when you're just out there, when you're eager to get some drugs, you're pursuing what you want, you know, it's like being blind to all other things. You're just, that's it." She further commented on direct examination that, at the time of the murder, her principal interests were "[s]urviving, the street, you know, drugs."

ther reveal continued drug abuse after 1989, also violated the defendant's constitutional rights. Extrinsic evidence is admissible to contradict a witness on a subject matter that is a material issue in the case. The defendant argues that both the evidence of emotional problems and of troubled relationships with Tourangeau's claimed sources of income also were probative of Tourangeau's motive, bias and interest. Therefore, the defendant argues, this evidence was improperly excluded.

Although Tourangeau had testified that her emotional anguish over witnessing the attack of the victim and not having done anything to help the victim had motivated her to come forward, the existence of emotional problems that predated the murder and continued thereafter did not divulge an ulterior motive for her testimony, or necessarily contradict Tourangeau's claimed reasons for coming forward. Also, although Tourangeau's financial situation was related to her motive because of the reward, evidence of her contentious relationships with both her husband and Maluk were not sufficiently contrary to her testimony that they had assisted her financially to undermine the trial court's exercise of its broad discretion. We conclude, therefore, that the trial court did not abuse its discretion by excluding this evidence.

We next consider whether the trial court's improper exclusion of evidence pertaining to Tourangeau's drug abuse and prostitution requires a new trial. Although the outright denial of a defendant's opportunity to impeach a witness for motive, bias and interest implicates the constitutional protection of the confrontation clause, such a denial is subject to harmless error analysis. *United States* v. *Anderson,* 881 F.2d 1128, 1139 (D.C. Cir. 1989); *State* v. *Santiago,* supra, 332. A new trial is therefore required only if the exclusion of the proffered evidence is not harmless beyond a reasonable doubt.

"Whether such error is harmless in a particular case depends upon a number of factors, such as 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' *State* v. *Milner,* [206 Conn. 512, 529, 539 A.2d 80 (1988)]; *State* v. *Oehman,* [212 Conn. 325, 332, 562 A.2d 493 (1989)]. Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. *State* v. *Ortiz,* 198 Conn. 220, 225, 502 A.2d 400 (1985)." *State* v. *Santiago,* supra, 333. If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. Id.

The importance of Tourangeau's testimony to the state's case against the defendant cannot be underestimated. The state conceded in its closing argument to the jury that it would have to credit Tourangeau's testimony to convict the defendant. See footnote 7. The exclusion of evidence bearing on the motivation of a chief witness for the state, particularly when no other evidence corroborated material aspects of the witness' testimony, is harmful error. See *State* v. *Santiago,* supra, 333–34; *State* v. *Corley,* 177 Conn. 243, 246–47, 413 A.2d 826 (1979); *State* v. *Annunziato,* 174 Conn. 376, 379–80, 387 A.2d 566 (1978). The state has not demonstrated beyond a reasonable doubt that the denial of the opportunity for the defendant to contradict Tourangeau as to her claimed new lifestyle and as to her desire for the reward money was harmless.

II

Our resolution of the defendant's first claim is dispositive of this appeal; however, we will address cer-

tain evidentiary claims of the defendant that may be likely to occur at the new trial.[21] The defendant claims that the trial court abused its discretion by making several evidentiary rulings that resulted in the exclusion of evidence that was probative of the credibility of Tourangeau and in the admission of evidence that was unduly prejudicial to the defendant. This claim of the defendant comprises three separate evidentiary rulings of the trial court.[22]

---

[21] We do not reach the following issues raised by the defendant: (1) whether the trial court improperly permitted an unrepresentative viewing of the crime scene; (2) whether the trial court improperly denied motions for disclosure of exculpatory information and failed to sanction the state for untimely disclosure of information; (3) whether the trial court failed to follow proper procedures in denying the defendant's request for access to medical records of the state's chief witness; (4) whether the trial court improperly barred the defendant from calling a witness on surrebuttal; (5) whether the trial court's jury instruction on consciousness of guilt and reasonable doubt diluted the state's burden of proof; and (6) whether the trial court's instruction on consciousness of guilt had a sufficient basis in the evidence.

[22] The defendant also challenges two rulings of the trial court that, he argues, curtailed his ability to develop a theme of police bias against the defendant as of 1988. The defendant contends that law enforcement officials, after failing to solve the murder for more than one year, developed a special interest in building a case against the defendant after Tourangeau gave her statement to the police. On appeal, the defendant claims that he was prohibited from asking two questions of the detective who had taken Tourangeau's statement that would have developed this theme. Before the trial court, however, the defendant did not articulate this theme of police bias, but instead claimed that the evidence might aid the jury in assessing Tourangeau's credibility.

Because the basis of the defendant's claim differs from the ground of his argument at trial, we decline to review it. "[R]eview of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. . . . The reason for this rule is clear: it is to alert the trial court to an error while there is time to correct it . . . and to give the opposing party an opportunity to argue against the objection at trial. To permit a party to raise a different ground on appeal than was raised during trial would amount to 'trial by ambuscade,' unfair both to the trial court and to the opposing party." (Citations omitted.) *State* v. *Sinclair,* 197 Conn. 574, 579, 500 A.2d 539 (1985).

The defendant, in an offer of proof during the defense case, introduced the testimony of Boyles regarding a threat that Tourangeau had made to her shortly before his third trial.[23] Boyles testified that she had been in a truck parked at the McDonald's restaurant on the highway in Milford when her companion began calling for "White Rabbit," Tourangeau's citizens band radio "handle," over the radio. Boyles had seen Tourangeau at the truck stop a few moments earlier. Boyles testified that after her companion said over the radio, "White Rabbit is hopping around from truck to truck," Tourangeau's voice came over the radio saying, "I'll give you hopping around . . . I have an eyeball on you, I know you, you know me . . . and just like I got rid of Cathy Jones I can get rid of you too." The trial court ruled that this testimony was inadmissible because it did not permit a reasonable inference by the jury that the threat had been directed at Boyles, rather than her companion.

On cross-examination of Tourangeau, the defendant sought to elicit that Tourangeau's brother, Ronald King, had been arrested on narcotics charges based on information provided to the police by the victim two months before the victim's murder. In an offer of proof outside the jury's presence, the defendant argued that this evidence was being offered to impeach Tourangeau because it demonstrated a motive for turning attention away from herself. The state objected to the admission of this evidence on the basis that it was evidence

---

[23] Boyles testified for the defense that she had been with Tourangeau and Cathy Jones on the night of the murder. She testified that the three women had driven around in Jones' car looking for heroin and then injecting themselves. Boyles further testified that she and Jones later dropped Tourangeau off at home at approximately 2 a.m., contrary to Tourangeau's testimony that Jones had dropped her off at Kimberly Avenue before 11 p.m.

Both Boyles and Jones had testified for the defense at the defendant's first trial as to this version of events on the night of the murder. Jones, however, never appeared to testify at the second trial.

of third party guilt without an adequate foundation. The trial court ruled that the defendant could ask Tourangeau whether she believed that she or a family member might be accused of committing the crime and whether that played a role in her going to the police, but that the defendant could not specifically identify Ronald King.

When, on cross-examination, Tourangeau denied that she or a family member might have become a suspect in the murder, the defendant again sought to introduce Tourangeau's knowledge of the victim's role in her brother's arrest. The trial court again sustained the state's objection, stating that the testimony would open the door to issues surrounding third party responsibility when there was not an adequate foundation for such evidence, and would inject collateral issues into the trial.

The defendant argues that, because the proffered evidence had a direct bearing on the credibility of Tourangeau, the above two rulings violated his constitutional rights to confrontation and to present a defense. The admissibility of evidence is generally a matter of state law and "unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved. . . ." (Internal quotation marks omitted.) *State* v. *Boles,* 223 Conn. 535, 545, 613 A.2d 770 (1992). We conclude that the defendant has failed to establish how the exclusion of this evidence deprived him of a constitutional right.

There was no evidence that the threat was made to Boyles rather than to her companion, whose remark prompted Tourangeau's response, and no indication that the threat related to her possible testimony at trial. Furthermore, the trial court admitted testimony from other witnesses that Tourangeau had been somewhere else when she said she had witnessed the murder, that

she had offered Jones money not to testify, and that she had told one acquaintance that she had not seen the murder but was testifying only for the money. Under these circumstances, we cannot conclude that the absence of this testimony prevented the defendant from exposing to the jury facts from which the jury could appropriately draw inferences relating to the reliability of the state's witness. *State* v. *Lewis,* 220 Conn. 602, 622, 600 A.2d 1330 (1991).

With respect to the evidence regarding the arrest of Tourangeau's brother, evidence of third party culpability must directly connect the third party to the crime. "It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citation omitted; internal quotation marks omitted.) *State* v. *Boles,* supra, 549; see also *State* v. *Ireland,* 218 Conn. 447, 451, 590 A.2d 106 (1991). Unless the direct connection exists, it is within the discretion of the trial court to refuse to admit such evidence. *State* v. *Payne,* 219 Conn. 93, 117, 591 A.2d 1246 (1991). The evidence relating to Tourangeau's brother would therefore not have been admissible as evidence of third party culpability.

Moreover, the trial court properly concluded that the probative value of the evidence was slight in comparison to the potential it posed for confounding the jury with collateral issues. "The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done." *State* v. *Boles,* supra, 549. The defendant had elicited from Tourangeau that she had herself threatened the victim at an earlier time, and was permitted to ask whether she believed that she or any family members were under suspicion with respect to the victim's murder. The addi-

tional fact that Tourangeau knew her brother had been arrested because of information the victim had provided the police had only marginal relevance outside of its tendency to direct responsibility for the murder toward another suspect.

The defendant also challenges the trial court's admission of evidence of the existence of guns at the defendant's residence on the ground that such evidence was unduly prejudicial to him. Early in the state's case-in-chief, the state offered the testimony of police officer Robert Brooks, who had executed a search warrant at Don Phillips Cafe on November 8, 1986, based on information that had been supplied by the victim. At that time, the defendant resided in an apartment owned by his father above the bar. Brooks testified that the defendant had been wearing a green army jacket on the night of the search.[24]

Prior to trial, the defendant filed a motion in limine to exclude testimony regarding the presence of a collection of guns located in the defendant's apartment at the time of the search. The state indicated that it did not think there would be any need to mention the collection of guns on direct examination. The trial court noted that, with respect to the search, "[i]t's a wide open door on redirect from anything that happens on cross. I'm not covering that bridge at this point . . . . I'll get to that later if it should happen."

On cross-examination of Brooks at trial, the defense challenged his ability to recall exactly what the defendant had been wearing on the night of the search. On redirect, Brooks was permitted to testify, over the defendant's objection, that he was able to remember the defendant's clothing because of the association he

---

[24] This testimony corroborated the testimony of Anthony Harris, who testified that he had seen the defendant walking with the victim on the night of the murder wearing such a jacket.

had made between the army jacket and the presence of an assortment of military rifles and a submachine gun in the apartment that were legally owned by the defendant.

The defendant argues that the testimony regarding the presence of guns was unduly prejudicial and outweighed the slight relevance of the evidence and therefore should have been excluded. We will overturn an evidentiary ruling of the trial court only if there is an abuse of discretion and a showing of substantial prejudice or injustice to the defendant. *State* v. *Alvarez,* 216 Conn. 301, 306, 579 A.2d 515 (1990). The defendant argues that the reasoning of *State* v. *Girolamo,* 197 Conn. 201, 496 A.2d 948 (1985), and *State* v. *Onofrio,* 179 Conn. 23, 425 A.2d 560 (1979), supports his argument of the prejudicial effect of this evidence. Those cases, however, involved a weapons violation and a murder by shooting.

In this case, guns played no role in the murder for which the defendant was charged, and the testimony made clear that the guns were legally owned. The testimony at issue was probative of how Brooks could clearly remember what the defendant had been wearing on a particular night more than four years prior to trial. Although we recognize the potential for such evidence to lead the jury to believe that the defendant was a violent individual; *State* v. *Girolamo,* supra, 207; we cannot conclude on this record that the trial court abused its discretion by admitting Brooks' testimony regarding the gun collection.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.