721 A.2d 329 (1998)
317 N.J. Super. 127
STATE of New Jersey
v.
Robert AINIS, Defendant.
Superior Court of New Jersey, Law Division, Camden County.
Decided August 31, 1998.
*330 Leonard S. Baker, Voorhees, for defendant Robert Ainis.
Kathleen Covert-Mininno, Assistant Camden County Prosecutor, for the State of New Jersey, (Lee A. Solomon, Camden County Prosecutor).
McNEILL, J.S.C.
I. BACKGROUND
On June 19, 1997, the defendant, Robert Ainis, entered a WaWa convenience store located at the intersection of Route 73 and Taunton Road in Berlin Township. Mr. Ainis approached the register clerk on duty while holding a hypodermic needle in his hand and motioning it toward the clerk. The defendant stated to the clerk, "Give me all the money unless you want to get AIDS." He further stated, "if you look at anybody weird, like there is something going wrong, I'll jump over the counter and kill you. Just start pushing buttons, and don't call anyone." The clerk gave the money in the register to the defendant, and the defendant took it and left.
On June 20, 1997, Mr. Ainis was apprehended in an unrelated matter, and he was subsequently identified by the WaWa register clerk as the person who had robbed the convenience store. As a result of the robbery and other events, Mr. Ainis pleaded guilty to one count of carjacking (First Degree), one count of eluding (Second Degree), one count of robbery (as amended to second degree), and one count of first degree armed robbery. Defendant agreed to respective sentences for these counts of 20 years (8 to be served without parole), 7 years (to be served concurrently), 7 years (to be served concurrently), and 11 years (flat). It is the count of robbery in the first degree for which the defendant received a sentence of 11 years that this court will now address. Specifically, the issues that need to be determined are: (1.) whether the use of a hypodermic needle, purportedly infected with the AIDS virus, to commit a robbery makes the act a "violent crime" under recently enacted N.J.S.A. 2C:43-7.2 (No Early Release Act), which fixes a minimum term of 85 percent of the sentence during which a defendant would not be eligible for parole; and (2.) what standard of proof the state needs to meet in order for the court to find that the act is a "violent crime" for purposes of the statute.
It is important to note that the facts which the court has before it in making its decision are only those which have been presented by the defendant in entering his guilty plea and the police reports and other documentation contained within the presentence report. The attorneys have agreed that the defendant's conduct, as related in his own words, is sufficient to constitute robbery in the first degree. Furthermore, the court found, after hearing the defendant's sworn testimony under oath, that an adequate factual basis existed for a guilty plea to the count of robbery in the first degree. By stipulation, counsel for both sides have agreed to submit to the court the question of whether a hypodermic needle is a deadly weapon, making the defendant's act a violent crime for sentencing purposes under 2C:43-7.2.
For the reasons set forth below, the court holds that the use of the needle makes the act a violent crime, that the applicable standard of proof is the "beyond a reasonable doubt" standard, and that the state has met this standard.
II. USE OF THE NEEDLE MAKES THE ACT A VIOLENT CRIME
The No Early Release Act mandates that persons who are sentenced to prison terms for committing crimes of the first and second degree involving violence be required to *331 serve at least 85 percent of the term of incarceration imposed by the court before being eligible for parole. The statute reads in relevant part:
a. A court imposing a sentence of incarceration for a crime of the first or second degree shall fix a minimum term of 85% of the sentence during which the defendant shall not be eligible for parole if the crime is a violent crime as defined in subsection d. of this section.
* * * * * *
d. For the purposes of this section, "violent crime" means any crime in which the actor causes death, causes serious bodily injury as defined in subsection b. of N.J.S. 2C:11-1, or uses or threatens the immediate use of a deadly weapon. "Violent crime" also includes any aggravated sexual assault or sexual assault in which the actor uses, or threatens the immediate use of, physical force.
For the purposes of this section, "deadly weapon" means any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury.

N.J.S.A. 2C:43-7.2
In the instant case, it is undisputed that Mr. Ainis did not cause death or serious bodily injury to the convenience store clerk. As a result, the only way this statute can be applicable to the defendant is if he used or threatened the use of a "deadly weapon" in the commission of the robbery. The court is therefore presented with the question: Is a hypodermic needle purportedly infected with the AIDS virus a deadly weapon for purposes of the statute? Given the circumstances of the instant case, the only logical answer to this question is "Yes."
A. The hypodermic needle in this case is a deadly weapon.
The statute is somewhat open-ended in defining what constitutes a deadly weapon. It leaves open to interpretation what may fall under the categories of "other weapon, device, instrument, material or substance," and understandably so, given the fact-sensitivity of the issue. Indeed it would be an extremely daunting and nearly impossible task to compile a list of every "animate or inanimate" object which could be a "deadly weapon" in a particular situation. Considering such a task raises the notion that the object being scrutinized cannot be viewed in isolation, but must be viewed in light of how it is employed by the defendant. It is with this in mind that the court proceeds with its analysis.
The Appellate Division grappled with this very notion in State v. Riley, 306 N.J.Super. 141, 703 A.2d 347 (1997), and provided what this court finds to be very persuasive analysis. In Riley, the defendant knocked the victim to the ground and took the victim's money. Upon the defendant's arrest, a three-bladed pocket folding knife was found in his pocket. The defendant was subsequently charged and convicted of first degree armed robbery. On appeal, the court in Riley stated that the problem it had related to the asserted armed feature of the robbery that elevated the offense from a second-degree to a first-degree crime. Id. at 145, 703 A.2d 347. Specifically, the court noted that the offense may be elevated if the defendant, in the course of committing the theft, "is armed with, or uses or threatens the immediate use of a deadly weapon." Id. at 146, 703 A.2d 347, quoting N.J.S.A. 2C:15-1b. In its analysis of what constitutes a "deadly weapon," the Riley court began with the definition provided in N.J.S.A. 2C:11-1c:
"Deadly weapon" means any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury.
It is important to note at this point that the Riley court interpreted N.J.S.A. 2C:11-1c in the context of first degree robbery, and that this court is dealing with the No Early Release Act and its definition of "deadly weapon." While recognizing that they are *332 different statutes, this court finds the issue to be the same in both cases, and the two definitions to be substantially similar so as to allow this court to adopt the following Riley analysis.[1]
The Riley court found that deadly weapons can be divided into two categories: (1.) fire-arms, which are per se deadly weapons and whose character is not, therefore, dependent on how they are used or intended to be used or on what the victim believes their deadly capacity is; an (2.) the all-inclusive category of every other material object that can be used or intended to be used in such a way as to cause death or serious bodily injury or is so fashioned to lead the victim to believe it has that capacity. Riley, 306 N.J.Super. at 146, 703 A.2d 347. The court further divided this second category into two discrete classes of objects: (1.) per se weapons that are not firearms, namely objects that, by their nature, have no apparent use or purpose other than the infliction of death or serious bodily harm and whose likelihood of possession for a lawful purpose is so remote that their possession by persons who are not members of the military or a law enforcement unit is interdicted by law; and (2.) the class of all those objects having a wide variety of lawful uses but which may take on the character of a deadly weapon because they are both capable of inflicting death or serious bodily injury and have in fact been so used or are intended to be so used or are so fashioned to lead the victim of a crime to believe they can be so used. Id. at 146-47, 703 A.2d 347. "The character of this class of objects as deadly weapons is, in every case, entirely circumstantialthat is, did a particular defendant possess a particular object at a particular time and in a particular situation with the intention of using it as a weapon." Id. at 147, 703 A.2d 347.
Based on the facts and surrounding circumstances of the present case, the court finds that the hypodermic needle as used by the defendant at the particular time and in the particular situation must absolutely be considered a deadly weapon. The defendant wielded the needle, motioning it toward the clerk, wanted the clerk to believe it was infected with the AIDS virus, and threatened to jump over the counter and kill her with it. To conclude from these circumstances that the needle was not a deadly weapon would defy common sense and fly in the face of rational thinking. It is generally known that AIDS is a deadly disease, it is obvious that the defendant intended to create the impression that he had a deadly weapon and was willing to use it, and the clerk had every reason to believe that she was being threatened with death or serious bodily injury. After all, would any reasonable person standing in that clerk's shoes be in a position to question or doubt the truth or sincerity of the defendant's contentions? This court thinks not. The defendant clearly intended to convey the message that this needle was a deadly weapon, and it surely was perceived in the same manner. As such, the court can see no other way to rule.
*333 While this issue appears to be one of first impression in this state, other jurisdictions have dealt with it and have reached similar conclusions. In People v. Nelson, 215 A.D.2d 782, 627 N.Y.S.2d 412 (1995), the New York Supreme Court, Appellate Division held that a hypodermic needle which the defendant claimed contained the AIDS virus constituted a "dangerous instrument" within the meaning of the Penal Law. Nelson, 215 A.D.2d at 783, 627 N.Y.S.2d 412. The court stated:
Pursuant to the Penal Law, a dangerous instrument is `any instrument, article or substance, ... which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury.' (Penal Law section 10.00[13] ). The object need not be inherently dangerous to fit within the statute. Rather, it is the use to which the instrument is put that brings it within the purview of the statute.
Id.
Interestingly, the court in Nelson made its determination that the hypodermic needle was a dangerous instrument while noting that the prosecution was not even required to prove the existence of the AIDS virus. In other words, the court found that the needle, by itself, was "readily capable of causing death or other serious physical injury." While finding this persuasive in its analysis, this court makes no determination today as to whether a hypodermic needle, alone, would rise to the level of a deadly weapon.[2]
In People v. Autry, 232 Cal.App. 3d 365, 283 Cal.Rptr. 417 (1991), the California Court of Appeal, in considering whether a hypodermic needle was a weapon for purposes of confiscation during a warrantless patdown search, held that "a hypodermic needle certainly presents a `threatening possibility.'" Id., 232 Cal.App.3d at 368, 283 Cal.Rptr. 417. California's definition of "deadly weapon" is quite similar to the one this court has in front of it: a "deadly" weapon is any object which is "used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." Id., quoting In re Jose R., 137 Cal.App.3d 269, 275-76, 186 Cal.Rptr. 898 (1982). The Autry court, in holding that the needle fit the definition, reasoned:
Drug abusers are not commonly recognized as among the more fastidious in our society, so the reasonable inference would be that the needles were probably unsterilized. It is now common knowledge that intravenous drug users contract AIDS from contaminated hypodermic needles. (citation omitted) Police officers understandably fear contracting AIDS or hepatitis from even accidental stabbings from hypodermic needles. (citation omitted) In view of such circumstances, a contaminated hypodermic needle is one of the more deadly objects one can imagine outside of firearms. There is presently no known cure for AIDS (citation omitted) so a single nick or scratch may prove fatal. A police officer might well prefer to face an assailant armed with a small caliber pistol rather than a drug addict with a hypodermic needle. The officer might recover from a gunshot wound, but just the merest scratch from the needle could prove fatal.
Autry, 232 Cal.App.3d at 368-69, 283 Cal. Rptr. 417.
This court finds these words from the California Court of Appeal to be quite poignant and highly relevant to the situation at bar. When the defendant Robert Ainis entered the WaWa convenience store, brandishing a hypodermic needle and threatening the clerk with the AIDS virus, would it have been at *334 all sensible for her to question Mr. Ainis about the sincerity of his statement, i.e., "Can you really give me AIDS?" The clerk's response to the defendant's actions was natural and instinctive. When faced with the defendant's threats, the clerk had every reason to suspect that Mr. Ainis was not among the more "fastidious" in our society, and that a "single nick or scratch" from his needle may prove fatal. As such, the court must hold that the hypodermic needle purportedly infected with the AIDS virus is a deadly weapon.
III. THE APPLICABLE STANDARD OF PROOF IS "BEYOND A REASONABLE DOUBT"
Counsel for each side in the instant case have argued that a different standard of proof should be met by the State in proving that the use of the hypodermic needle in robbing the convenience store constituted a deadly act. Specifically, the prosecutor contends that the State need only show by a preponderance of the evidence that the needle is a deadly weapon, whereas defense counsel contends that the State must prove this fact beyond a reasonable doubt. The court finds that the "beyond a reasonable doubt" standard is the one to be applied in this matter, and the court finds that this standard has been met by the State.
N.J.S.A. 2C:1-13 states:
a. No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt. In the absence of such proof, the innocence of the defendant is assumed.
* * * * * *
d. When the application of the code depends upon the finding of a fact which is not an element of an offense, unless the code otherwise provides:
(1) The burden of proving the fact is on the prosecution or defendant, depending on whose interest or contention will be furthered if the finding should be made; and
(2) The fact must be proved to the satisfaction of the court or jury, as the case may be.
If the court uses 2C:1-13 as a guideline for its decision, the narrow issue it needs to decide is whether use of a deadly weapon is an element of the offense with which the defendant is charged. This is somewhat perplexing because the court is considering this issue in the context of a sentencing provision (2C:43-7.2), and not in the context of actual proof of a crime. However, the court finds that the standard of proof for sentencing should be the same that it would be for proof of the crime.
A. The standard for First Degree Armed Robbery ("Beyond a Reasonable Doubt") should be applied here.
It is unquestionable that in order to convict a defendant of robbery, he must be found guilty beyond a reasonable doubt. See State v. Orlando, 269 N.J.Super. 116, 126, 634 A.2d 1039 (1993), State v. Hammock, 214 N.J.Super. 320, 322, 519 A.2d 364 (1986). Robbery is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon. N.J.S.A. 2C:15-1(b). Thus, in order to convict a defendant of first degree armed robbery, the State must prove one of these statutory standards beyond a reasonable doubt. Since one of the standards is "... immediate use of a deadly weapon," this court sees no reason why this standard should be lowered for purposes of sentencing, and the court is satisfied that the State has met this standard in the instant case.
IV. CONCLUSION
The message that Mr. Ainis sent, and which the clerk received and understood, was one cloaked in deadly language. He sought to convey an immediate and apparent ability to kill the convenience store clerk, and the court is satisfied that the State has proven this beyond a reasonable doubt. Thus, the court holds today that the wielding of the hypodermic needle in these circumstances, *335 coupled with the threatening words of the defendant, is sufficient to raise the status of the needle to that of a deadly weapon. As a result, Mr. Ainis' First degree armed robbery was a "violent crime" for purposes of N.J.S.A. 2C:43-7.2, and a minimum term of 85 percent of his 11 year sentence must be served before he will be eligible for parole.
NOTES
[1] Specifically, the court recognizes that the words "or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury" added on the end of the definition in N.J.S.A. 2C:11-1c is the difference between the definition in 2C:11-1c and the definition contained in N.J.S.A. 2C:43-7.2d. The historical and statutory notes to 2C:11-1c indicate that this language was added by amendment in 1981. It is important for this court to address at this point the so-called "objective" and "subjective" tests. In State v. Butler, 89 N.J. 220, 445 A.2d 399 (1982), the Supreme Court of New Jersey interpreted the pre-amendment language of 2C:11-1c (which is the same language contained in 2C:43-7.2d) as establishing an "objective" test, meaning that "the weapon itself must exist and be of a type that would ordinarily be capable of causing a grievous or fatal injury." Butler, 89 N.J. at 229, 445 A.2d 399. The Court opined that the language added by the 1981 amendment indicated the Legislature's desire to broaden the definition previously existing for the term "deadly weapon." Id. at 229, n. 3, 445 A.2d 399. The Court went on to state that this changed the test of 2C:11-1c from objective to subjective, i.e., whether the object as it is used would appear to be a deadly weapon from the victim's standpoint. Id. at 230, 445 A.2d 399. This raises the issue of what test, objective or subjective, should be applied to the case at bar, and whether this determination would affect the application of the Riley analysis. This court finds that the additional language which purportedly changes the test from objective to subjective is simply a matter of semantics, that the language "in the manner it is used or is intended to be used" from 2C:43-7.2d should be interpreted as subjective in nature, and that the weapon analysis of Riley is applicable.
[2] This implicates the issue that both prosecution and defense raised in their briefs: whether a hypodermic needle by itself can be viewed objectively as a deadly weapon. As discussed supra, a deadly weapon is one that can cause serious bodily injury. Serious bodily injury is defined in N.J.S.A. 2C:11-1b as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." The court in State v. Mieles, 199 N.J.Super. 29, 488 A.2d 235 dealt with a similar issue in deciding whether a BB gun was a deadly weapon, and whether it was capable of causing serious bodily injury. The court stated, "Surely it could not be seriously contended that if a BB struck a person in the eye he could not be injured." Id. at 37, 488 A.2d 235. Similarly, a needle plunged into the eye of a person could cause serious, permanent damage to the eye, which is a bodily organ. However, the court need not decide this issue at the present time.