744 A.2d 246 (2000)
327 N.J. Super. 579
STATE of New Jersey, Plaintiff-Appellant,
v.
George T. GRAWE, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 2000.
Decided February 1, 2000.
*247 Nichole M. Miles, Assistant County Prosecutor, for plaintiff-appellant (Jeffrey S. Blitz, Atlantic County Prosecutor, attorney; Ms. Miles, on the brief).
James K. Smith, Jr., Assistant Deputy Public Defender, for defendant-respondent (Ivelisse Torres, Public Defender of New Jersey, attorney; Mr. Smith, on the brief).
Before Judges KING, PAUL G. LEVY and CARCHMAN.
The opinion of the court was delivered by KING, P.J.A.D.

I
In this case defendant entered into a plea agreement with alternative sentencing options. In return for a plea of guilty to first-degree robbery, N.J.S.A. 2C:15-1, the State agreed to dismiss the remaining six counts of a seven-count indictment. The plea agreement left open for the judge to decide the applicability of the sentencing provisions of the "No Early Release Act," (NERA or the Act), N.J.S.A. 2C:43-7.2, L. 1997, c. 117, § 2, effective June 9, 1997. This Act requires service of 85% of the maximum or base sentence if defendant "uses or threatens the immediate use of a deadly weapon" in the commission of a violent crime. Under the plea agreement, if the Act did not apply, the State would recommend an eleven-year maximum with a three-and-one-half year term of parole ineligibility. If the Act applied, the judge would impose a ten-year flat term and invoke the Act's 85% parole ineligibility minimum, or eight-and-one-half years.
After conducting a plenary hearing, the judge found that NERA did not apply and imposed an eleven-year sentence with a parole ineligibility term of three-and-one-half years. The judge stayed the sentence but revoked bail pending this appeal by the State. We find that the judge's factual conclusion that defendant did not use or threaten the use of a deadly weapon was reasonably grounded in the evidence and *248 affirm. State v. Locurto, 157 N.J. 463, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 199 A.2d 809 (1964).

II
NERA requires that persons who are sentenced to prison terms for committing crimes of the first and second-degree involving violence serve at least 85% of the term of incarceration before eligibility for parole. State v. Ainis, 317 N.J.Super. 127, 130, 721 A.2d 329 (Law.Div.1998). At least twenty-seven states and the District of Columbia have enacted legislation similar to N.J.S.A. 2C:43-7.2, which has uniformly withstood constitutional challenge. See State v. Meyer, 327 N.J.Super. 50, 742 A.2d 614 (App.Div.2000); State v. Johnson, 325 N.J.Super. 78, 89, 737 A.2d 1140 (App. Div.1999). NERA provides that
a. A court imposing a sentence of incarceration for a crime of the first or second degree shall fix a minimum term of 85% of the sentence during which the defendant shall not be eligible for parole if the crime is a violent crime as defined in subsection d. of this section.

[2C:43-7.2(a).]
For purposes of this section, "violent crime" is defined as
any crime in which the actor causes death, causes serious bodily injury as defined in subsection b. of N.J.S. 2C:11-1, or uses or threatens the immediate use of a deadly weapon. "Violent crime" also includes any aggravated sexual assault or sexual assault in which the actor uses, or threatens the immediate use of, physical force.
For purposes of this section, "deadly weapon" means any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury.

[2C:43-7.2(d) (emphasis supplied).]
Without dispute, defendant neither caused death nor serious bodily injury. The only way the statute can be applied to this defendant is if he used or threatened the immediate use of a deadly weapon during the commission of the robbery.
Judge Neustader's plenary sentencing hearing to resolve this factual issue revealed these facts. On September 24, 1997 defendant robbed two employees in Bernie Robbins jewelry store located in Somers Point, Atlantic County. The State presented four witnesses, the two employees of the jewelry store, Steven Jaffe and Stewart Schupler, and two law enforcement officers, Sergeant Robert Somers and Investigator James McGarry. In addition to their testimony, the judge viewed a videotape of the crime in progress from a surveillance camera in the store. We also have reviewed the videotape.
According to Schupler, on the afternoon of September 24, 1997 at about 4 p.m., a young white male wearing white pants and a dark jacket, later identified as defendant, entered the Bernie Robbins jewelry store in Somers Point. Defendant approached Schupler and asked to see the store's selection of Rolex and Piaget watches. Schupler first showed defendant the watches in the Rolex case and then showed him the watches in the Piaget case nearby. After seeing the Piaget watches, defendant asked Schupler to see the Rolex watches again. Upon looking at the Rolex watches again, defendant told Schupler he wanted to purchase one for his girlfriend. From behind the Rolex counter, Schupler walked a few steps to obtain the warranty papers. He then returned to retrieve the Rolex box located underneath the Rolex case. Schupler turned away from defendant as he retrieved the box. When he turned back, Schupler said that defendant appeared to be "getting a little nervous at that point." When Schupler approached defendant with the Rolex box, defendant "lifted his shirt up" and "pulled out a pair of gloves." At the same time, Schupler said he saw *249 "something metal in [defendant's] pants." Schupler said that "when I saw something metal and it was gray, I'm thinking gun." Defendant told Schupler to "get back" and not to push any buttons. Schupler said that "as [defendant] went to pull the hammer or that object out, at that point I still wasn't sure what it was." Schupler explained that defendant "started going forward a little bit, and he pulled it out I thought I was going to get hit." At this point, Schupler said he thought he was going to be hit with the hand-held hammer.
Schupler saw defendant prepare to swing the hammer. Schupler stepped back about two or three feet from the show-case. When asked whether he thought the hammer was "coming at him" he said "[a]t that point I wasn't sure, and then he made contact with the case, so..." Defendant swung the hammer and smashed the Rolex case between Schupler and defendant. Defendant hit the front of the Rolex case, not the top. Schupler said that when defendant was about to swing the hammer, he "didn't know if it was going to be the case or my head." After viewing the surveillance tape, Schupler agreed that defendant did not raise the hammer above his waist when he broke the Rolex case.
Steven Jaffe testified that he was waiting on a customer across the room about fifteen to twenty feet away "when I happened to look up and I saw the hammer in [defendant's] hands coming down and I heard the glass break." Jaffe said after the glass broke, defendant started to reach into the Rolex case and take the watches. Jaffe testified that at this time he did not know the location of the hammer.
The videotape showed that the hammer ended up on the floor in front of the Rolex case and that defendant kicked the hammer away from the case. After smashing the Rolex case, defendant began calling out, "Where's Jaffe?" Defendant called Jaffe's name two or three times hollering, "Where's Jaffe? Where's Jaffe?" After the second or third time, Jaffe responded, "I'm here." Defendant told Jaffe that he knew he lived in northeast Philadelphia, and that he had a wife and two children "and that if he wasn't out of the store, Jaffe was going to have a problem." Jaffe said that he believed that defendant would hurt him and his family.
After taking the Rolex watches, defendant picked up the hammer from the floor and walked over to the Piaget case. (The series of events which occurred after defendant picked up the hammer and proceeded to the Piaget case were not captured by the surveillance tape.) The Piaget case is a box of crystal which sits on top of another watch case. Schupler testified he was "99 percent sure" that defendant had the hammer in his possession when he walked over to the Piaget case. Defendant, holding the hammer, told Schupler to give him the Piaget watches out of that show case. Defendant did not smash the Piaget case. Schupler said he thought he was going to be attacked if he did not listen to defendant. He gave defendant the watches. Schupler testified that when defendant asked him to hand him the watches from the Piaget case "the hammer was held up," but, according to defense counsel's persuasive argument accepted by the judge, defendant "at no time ... raise[d] it as a weapon." Schupler did testify that he believed defendant would hurt him if he did not cooperate with his demands.
On cross-examination Schupler said he thought that "[t]he hammer was in [defendant's] hands the whole time he was breaking into the Rolex case, as he walked down to the Piaget case, up until I was actually loading the watches into the satchel." He also claimed that defendant never placed the hammer on the floor. To the contrary, Schupler emphasized that defendant placed it on the counter.
After viewing the videotape, Schupler acknowledged that defendant never raised the hammer above his waist while he was *250 in front of the Rolex case. Schupler also admitted that defendant did not have the hammer in his hand while he emptied the Rolex case. In fact, defendant had dropped the hammer on the ground in front of the case and kicked it aside. Schupler said he was not sure whether defendant was going to break the Rolex counter or hit him with it. Schupler testified that "[w]hen we were at the Piaget case ... I had no idea what he was going to do with the hammer." When asked whether defendant said anything to him which caused him to believe that he was threatening him with the hammer, Schupler responded, "[n]o, he didn't have to say anything." Schupler said "[h]e was close enough to me that if I didn't do what he asked me to do, I have no idea what he was going to do with the hammer." Schupler conceded that in his statement to the police he said defendant exclaimed, "I'm going to break the case if you don't give me the watches."
After collecting the Piaget watches, defendant abandoned the hammer on top of the counter next to the Piaget case about six to eight feet away from the Rolex case. Defendant then fled the store through the rear without the hammer. As defendant was leaving the store, he again called out Jaffe's name, told him "not to hit the button," and said something to the effect that if defendant did not meet with someone in twenty minutes, as planned, Jaffe was going to "have a problem." This statement apparently was a reference to Jaffe's family. Neither Schupler nor Jaffe tried to stop defendant from stealing the watches during the course of the robbery.
Judge Neustadter, without objection, applied the preponderance of the evidence standard[1] and said:
Violent crime is defined as any crime in which the actor, meaning the defendant, causes death which did not happen [in] this case, causes serious bodily injury, which hasn't happened [in] this case, or threatens the immediate use of a deadly weapon. Deadly weapon is defined as any firearm or other instrument which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.
Now, while that sledgehammer in evidence is known to be capable of producing death or serious bodily injury, I do not find that the State has carried the burden by even a preponderance of the evidence of establishing that this defendant used or intended to use that hammer as a deadly weapon.
I have to decide whether he used that hammer as a weapon to cause death or serious bodily injury or intended to do so. And I cannot find that from the evidence before me. I believe and I find as a fact that his intent was to use that hammer to break the show cases no more, no less. And under those circumstances [and] under those facts his case does not come within the 85 percent no parole rule.

III
This situation called upon Judge Neustadter to make findings of fact and draw reasonable inferences from these findings on whether defendant "threatened the immediate use of a deadly weapon" within the meaning of NERA, N.J.S.A. 2C:43-7.2. In our system, this is quintessentially a task for the trial judge. "New Jersey courts under the new system have held that findings of fact made by trial judges in non-jury cases must be affirmed if amply supported by the evidence; or by competent, reasonably credible evidence; that such findings are entitled to great *251 weight on appeal;" Johnson, 42 N.J. at 160, 199 A.2d 809; see Locurto, 157 N.J. at 474, 724 A.2d 234. We owe the judge's findings in this situation considerable deference. "Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." Locurto, 157 N.J. at 474, 724 A.2d 234. We have no quibble on this record with the judge's factual conclusion that on the preponderance of the evidence the hand-held hammer was used here as a burglar's tool rather than as a menacing, deadly weapon.
Certain recent historical background is helpful in understanding our statutory scheme. In State v. Riley, 306 N.J.Super. 141, 146, 703 A.2d 347 (App.Div.1997), we faced the issue of whether defendant was armed with a deadly weapon "simply by reason of the pocket knife having been on his person during the course of the robbery." Stated slightly differently, the issue was whether the proofs permitted the finding that defendant's pocket knife was, in the circumstances of the robbery, permissibly categorized as a deadly weapon. Id. at 148, 703 A.2d 347. In Riley defendant was charged and convicted of first-degree robbery. He appealed, arguing that because the victim never had knowledge of the knife, the robbery could not be elevated from second-degree robbery to first-degree. We agreed, holding that a robbery may only be elevated to first-degree where defendant is "armed with, or uses or threatens the immediate use of a deadly weapon." Id. at 146, 703 A.2d 347; N.J.S.A. 2C:15-1(b).
In determining what constituted a "deadly weapon" we recognized there are two discrete categories. The first is firearms, which are per se deadly weapons "whose character as deadly weapons is not... dependent on how they are used or intended to be used or on what the victim believes their deadly capacity is." Riley, 306 N.J.Super. at 146, 703 A.2d 347. The second category is the "all-inclusive category of every other material object that can be used or intended to be used in such a way as to cause death or serious bodily injury or is so fashioned to lead the victim to believe it has that capacity." Ibid. This second category consists of two discrete classes of objects: the first includes per se weapons that are not firearms weapons that are "presumed by law to be possessed with the intention of causing death or serious bodily injury unless possessed... by persons who have legitimate safety reasons for their possession." Id. at 146-47, 703 A.2d 347. The second class includes
all those objects having a wide variety of lawful uses but which may take on the character of a deadly weapon because they are both capable of inflicting death or serious bodily injury and have in fact been so used or are intended to be so used or are so fashioned to lead the victim of a crime to believe they can be so used. [Id. at 147, 703 A.2d 347.]
We observed that the character of this class of objects as deadly weapons is, "in every case, entirely circumstantialthat is, did a particular defendant possess a particular object at a particular time and in a particular situation with the intention of using it as a weapon." Ibid. (emphasis supplied). We stated that under the pre-Code formulation, to prove that the knife in question was dangerous, the State had to demonstrate that defendant intended to use the knife as a weapon in the robbery. Id. at 149, 703 A.2d 347 (citing State v. Best, 70 N.J. 56, 66, 356 A.2d 385 (1976)). We further said that "it is the intended use that makes the otherwise lawful implement a weapon, and thus the defendant's actual or presumed state of mind in possessing the implement is critical to the determination of whether the implement is a weapon at all." Id. at 150, 703 A.2d 347 (emphasis supplied).
In Ainis, the issue was whether a hypodermic needle was a "deadly weapon" within the meaning of then newly-adopted *252 1997 NERA under the particular facts. Defendant entered a "WaWa" convenience store, approached the store clerk "while holding a hypodermic needle in his hand," and "motioning it toward the clerk," stated, "[g]ive me all the money unless you want to get AIDS." Ainis, 317 N.J.Super. at 128, 721 A.2d 329. Defendant also said that "if you look at anybody weird, like there is something going wrong, I'll jump over the counter and kill you. Just start pushing buttons, and don't call anyone." Id. at 128-29, 721 A.2d 329.
The issue under NERA was novel in our State. The Law Division judge in Ainis adopted the Riley "deadly weapon" analysis and sensibly found that the hypodermic needle used by defendant at the particular time and in the particular manner should be considered a deadly weapon. Id. at 133, 721 A.2d 329. In addition, the Law Division judge found that the "beyond a reasonable doubt" standard applied, id. at 136, 721 A.2d 329, a question not before us today. Absent the direct and imminent threats, it is questionable whether the Law Division judge would have considered the hypodermic needle a "deadly weapon" under the NERA.
In State v. Burford, 321 N.J.Super. 360, 729 A.2d 52 (App.Div.1999), certif. granted, 162 N.J. 128, 741 A.2d 96 (1999), the issue before us was whether defendant's use of a stolen automobile to elude police and his reckless striking of another vehicle during the chase made the stolen automobile a "deadly weapon" under NERA. We found under the circumstances presented that as a matter of law, the stolen vehicle was not used as a deadly weapon. We said that "there may be circumstances where an automobile can be used as a deadly weapon. Indeed, almost every object, animate or inanimate, can be used as a deadly weapon under certain circumstances." Id. at 364, 729 A.2d 52. Referring to Riley, we concluded that because defendant did not intend to use the car as a deadly weapon, NERA did not apply. Id. at 365, 729 A.2d 52. See also State v. Ferencsik, 326 N.J.Super. 228, 231, 741 A.2d 101 (App.Div.1999) (holding NERA applies to reckless vehicular homicide where defendant caused death by driving recklessly in violation of N.J.S.A. 2C:11-5a); State v. Newman, 325 N.J.Super. 556, 561, 740 A.2d 153 (App.Div.1999) (holding that reckless manslaughter was a "violent crime" to which the NERA applied).
In State v. Johnson, 325 N.J.Super. at 83, 737 A.2d 1140, an eleven-count indictment was returned against defendant accusing him of related crimes arising out of his alleged robbery of two customers of a check-cashing establishment on successive days and his possession of a firearm when he was arrested a week later. Following two jury trials, a judgment of conviction was entered resulting in a verdict of guilt of one of the charges of first-degree robbery; one charge of second-degree possession of a firearm with intent to use it unlawfully against a person; and two charges of third-degree possession of a firearm without a permit. Id. at 81, 737 A.2d 1140. Defendant was sentenced to a base term of eighteen years on the first-degree crime and to concurrent maximum base terms on the other three. Id. at 81-82, 737 A.2d 1140. Because the first-degree crime was a crime of violence as defined under the NERA, a parole ineligibility term of eighty-five percent of the base term was imposed specifically fifteen years, three months and eighteen days. Id. at 82, 737 A.2d 1140 A parole ineligibility term of eighty-five percent under NERA was also imposed on the second-degree weapons possession crime, and maximum parole ineligibility periods were imposed on the two third-degree crimes. We held NERA did not apply to the possession offense. We remanded for re-sentencing on the conviction of second-degree possession of a firearm for an unlawful purpose, saying
[w]e think it plain that a purely possessory crime does not meet this definition. One cannot by mere possession with an unlawful purpose be deemed to have actually caused either death or serious *253 bodily injury or used or threatened the immediate use of a deadly weapon. These are certainly elements of the robberies for which defendant was indicted and, certainly, threat of use of a deadly weapon was an element of the robbery of which defendant was convicted. But they are not elements of the purely possessory crime. A defendant must do more than have the intent to use the weapon unlawfully against the person of another before he meets the statutory definition of a violent criminal. We agree with the holding in State v. Thomas, 322 N.J.Super. 512, 518, 731 A.2d 532 (App.Div.1999) that the No Early Release Act must be strictly construed. Under that canon of construction, we are satisfied that purely possessory crimes must be excluded from its reach. We therefore vacate the sentence imposed on the second-degree possessory crime and remand for re-sentencing on that conviction alone.
[Id. at 89-90, 737 A.2d 1140 (emphasis supplied).]
See State v. Rumblin, 326 N.J.Super. 296, 302, 741 A.2d 138 (App.Div.1999) (finding the NERA applicable where defendant admitted accomplice culpability in an armed robbery with firearms, particularly where his plea agreement acknowledged that applicability).
In State v. Thomas, 322 N.J.Super. 512, 731 A.2d 532 (App.Div.1999), defendant pled guilty to second-degree sexual assault for touching a child, age eleven, in her "vaginal area" but he did not admit to any penetration. No weapon was involved. The State on its appeal argued that NERA applies in any case where a defendant commits a sexual assault designated as a crime of the first or second-degree where the victim does not affirmatively and freely give permission for the act of sexual contact. Id. at 516, 731 A.2d 532. We agreed with the trial judge that the "No Early Release Act clearly requires an independent act of force or threat of force against the victim that is additional to the constituent elements of the crime." Ibid. Moreover, we stated that "general principles of statutory construction mandate strict construction of a criminal statute." Id. at 518, 731 A.2d 532. We also stated that "[a]gravated sexual assault or sexual assault does not meet that definition unless the actor uses or threatens the immediate use of physical force." Id. at 520, 731 A.2d 532. We found the NERA inapplicable.
NERA's definition of "deadly weapon" is akin to but not identical to the definition now found in the robbery statute which was modeled after the Model Penal Code. See N.J.S.A. 2C:11-1(c) (Chapter 15 on robbery incorporated by reference). "Deadly weapon" as defined in the robbery statute means
any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury.

[N.J.S.A. 2C:11-1 (emphasis supplied).]
The emphasized language above was added in 1981 and became effective on January 4, 1982. See L. 1981, c. 384, § 1.
In State v. Butler, 89 N.J. 220, 226-31, 445 A.2d 399 (1982), our Supreme Court held that a toy gun or a finger in a pocket simulating a gun was not a deadly weapon under the then-applicable robbery statute which required the actor use or threaten "the immediate use of a deadly weapon." Id. at 226, 445 A.2d 399 (citing N.J.S.A. 2C:15-1(b)). However, by the time Butler was decided the Legislature had amended the prior definition to include the above-emphasized language in N.J.S.A. 2C:11-1. The present status of our law is that any device, instrument or the like will make a robbery a crime of the first degree if the victim reasonably believes *254 the perpetrator is armed with a deadly weapon. See State v. Orlando, 269 N.J.Super. 116, 634 A.2d 1039 (App.Div. 1993); see State v. Hickman, 204 N.J.Super. 409, 414-415, 499 A.2d 231 (App.Div. 1985); see Cannel, New Jersey Criminal Code Annotated, comment on N.J.S.A. 2C:15-1 (n. 6 "deadly weapon, statutory history"). This section of the Code still requires at least some simulation of the possession of a weapon. Thus, simply a victim's belief or an assailant's statement that he had a weapon is insufficient. Even a newspaper or a finger could be a sufficient object if it is fashioned in a manner to cause the victim to believe that it is or conceals a weapon.
Initially, one might be perplexed to reconcile Judge Neustadter's acceptance of defendant's guilty plea to first-degree robbery and his factual conclusion that NERA is inapplicable. This seeming anomaly is explicable because on close examination the definition of deadly weapon for purposes of the robbery statute and for NERA differ somewhat. NERA omits the language "or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury." For purposes of NERA, the intent and conduct of defendant and not the belief, reasonable or not, of the victim controls for sentencing purposes. The judge's acceptance of the armed-robbery guilty plea while finding NERA inapplicable is not inconsistent.
Judge Neustadter articulated this quite well when integrating his findings with his legal conclusions. He said:
So [Schupler] was in fear because he didn't know what could happen and that's what makes it an armed robbery, that the victim was reasonably in fear, and that's the test that is used to determine whether it's an armed robbery or not, what is perceived by a reasonable victim. So Mr. Schupler's fear that, that [it] could be used against him makes it an armed robbery, but this is a different section. This section has to do with whether a person should be serving 85 percent of a sentence and it's based on a different statute. And it is provided in this statute that it has to be a violent crime in order to come within the 85 percent rule.
Now, if the defendant used this hammer to break a show case and that's all he did with it and that's all he intended to do with it 
[W]hat they say they perceive by way of fear does not mean that, that's what he intended to do. Did he ... mean to put fear in them or did he threaten them in any way? Did he say, [i]f you don't do this, I'm going to do this with this hammer, or hold you in a menacing or threatening way? Is there any evidence before me that suggests that?
* * * * *
[Yes] but the statute says that the State has to prove that the manner in which he used it or intended to use it.
* * * * *
[Yes] but the evidence that was presented indicates and the videotape [shows] that he took the hammer out and didn't threaten anybody with it. He went right to the glass and broke it and then threw the hammer down.
There may have been a dual purpose to help him carry out the robbery and also to break the show case .... The State has the burden of proof.
Clearly defendant possessed the hammer during the commission of the crime. Unclear, however, is whether that defendant used the hammer as a "deadly weapon" under NERA. There is no admission from defendant that he intended to use the hammer for anything other than to break the glass case. Defendant made no present *255 threats against the person of either Schupler or Jaffe. Defendant did not raise the hammer above his head at any time. He smashed the front of the Rolex case, not the top. The threats defendant directed toward Jaffe about harming his family members were threats of future, not present harm. As recognized by the judge, future threats are not controlling in this context.
We find the judge reasonably concluded that the State failed to meet its burden to establish defendant intended to use the hammer as a deadly weapon. Regardless of his guilty plea to first-degree robbery, the judge reasonably found defendant intended only to use the hammer as part of his plan to commit a theft, not a violent assault. While a person in either Jaffe's or Schupler's position would fear the possibility of immediate bodily injury, that fear is not controlling under NERA.
Having the opportunity to view the videotape, we observed that defendant never raised the hammer above his waist while he was in front of the Rolex case. Defendant did not have the hammer in his hand while he emptied the Rolex case in fact, defendant almost certainly dropped the hammer on the ground in front of the case and kicked it aside. Even if defendant had the hammer in his hand when he walked over to the Piaget case, the State produced no evidence suggesting that he raised the hammer above his head at that time or threatened Schupler in any way. Defendant just said, "give me the watches or I'll break the case." When we examine defendant's intent using an objective standard, his use of the hammer did not constitute a "using or threatening the use of a deadly weapon" under NERA. The State failed to meet its burden, whether beyond a reasonable doubt or by a preponderance of the evidence.
Affirmed.
NOTES
[1] "As to the standard of proof of facts making the Act applicable, see State v. Ainis, 317 N.J.Super. 127, 137, 721 A.2d 329 (Law Div. 1998), and State v. Oliver, 298 N.J.Super. 538, 560, 689 A.2d 876 (Law Div. 1996), aff'd o.b., 316 N.J.Super. 592, 720 A.2d 1001 (App.Div. 1998), which disagree. The former requires proof beyond a reasonable doubt, the latter, proof to the satisfaction of the court under 2C:1-13d." [Cannel, New Jersey Criminal Code Annotated, comment on N.J.S.A. 2C:43-7.2.]