******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ROBERT LEANDRY
(AC 36741)

DiPentima, C. J., and Lavine and Keller, Js.

*Argued September 8—officially released November 17, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Suarez, J.)

*Kirstin B. Coffin*, assigned counsel, for the appellant (defendant).

*Matthew R. Kalthoff*, special deputy assistant state's
attorney, with whom, on the brief, were *Gail P. Hardy*,
state's attorney, and *John F. Fahey*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Robert Leandry, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3) and assault in the second degree in violation of General Statutes § 53a-60 (a) (2). On appeal, the defendant claims that (1) the evidence was insufficient to support the judgment of conviction for both counts, (2) the trial court improperly charged the jury on robbery in the first degree, and (3) the court abused its discretion in certain evidentiary rulings. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts that are relevant to this appeal. In September, 2012, Patrick Jalbert was employed by an independent security company, which provided security services to Save-A-Lot, a grocery store in Hartford. After Jalbert observed the defendant behaving oddly in the grocery store, he went to the management office to view the store's surveillance monitors. Jalbert then observed the defendant walk to the freezer aisle section of the store, select bags of frozen shrimp, and pack the bags into his pants. Having confirmed that the defendant bypassed the cashiers and exited the store with the merchandise, Jalbert immediately left to intercept the defendant.

Once outside, Jalbert confronted the defendant. After Jalbert told him to stop, the defendant removed one bag of frozen shrimp from his pants, placed it on top of nearby shopping carts, and started to walk away. Knowing that more merchandise was hidden inside the defendant's pants, Jalbert grabbed the defendant's arm to prevent him from leaving. When Jalbert attempted to handcuff him, the defendant resisted and stated: "I have a needle."[1] After this statement, while trying to separate himself from the defendant, Jalbert felt something stab him in his left forearm. Although Jalbert did not see the hypodermic syringe at that moment, he saw a blood mark on his arm.

The defendant then ran into the plaza parking lot. As Jalbert pursued him, he was able to see a hypodermic syringe in the defendant's right hand. During the defendant's attempt to flee, an employee from the adjacent furniture store joined in the pursuit. When both men approached him, the defendant stated that he was infected with AIDS, hepatitis, or "something to that effect." The employee from the furniture store was first to reach the defendant, which prompted Jalbert to warn him that the defendant had a hypodermic syringe. After a brief struggle, both men managed to subdue the defendant, and Jalbert handcuffed him.

Within minutes, officers from the Hartford Police Department arrived on the scene. Officer Kenneth Labbe spoke with Jalbert, who explained what had

occurred with the defendant, including having been stabbed with a hypodermic syringe. Labbe noticed a mark on Jalbert's forearm that was consistent with being stabbed with a hypodermic syringe. While Labbe was speaking with Jalbert, the defendant was "spontaneously uttering . . . [that] he did not have HIV and that he only had hepatitis." Jalbert was transported to Saint Francis Hospital and Medical Center in Hartford via ambulance, where he was treated for superficial scratches, what appeared to be puncture wounds, and exposure to a blood-borne pathogen.

The defendant was charged with robbery in the first degree and assault in the second degree. The jury found the defendant guilty on both counts. The court sentenced him to a total effective term of eight years of incarceration and five years special parole. This appeal followed. Additional facts will be set forth as necessary.

I

SUFFICIENCY OF EVIDENCE CLAIMS

The defendant first claims that there was insufficient evidence to support his conviction on both counts. Specifically, he argues that the evidence presented by the state does not support a conviction of robbery in the first degree because it fails to show that he either used or threatened to use a dangerous instrument. In addition, the defendant argues that the evidence does not establish that he was guilty beyond a reasonable doubt of assault in the second degree because the evidence fails to show that he intended to or caused physical injury to Jalbert.

We first begin by setting forth the law relevant to an insufficiency of the evidence claim. As a preliminary matter, "[a] defendant who asserts an insufficiency of the evidence claim bears an arduous burden." *State* v. *Hopkins*, 62 Conn. App. 665, 669–70, 772 A.2d 657 (2001). This court "[i]n reviewing [a] sufficiency [of evidence] claim . . . [applies] a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . .

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and

logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . We ask . . . whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . .

"Furthermore, we are mindful that [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . The scope of our factual inquiry on appeal is limited. This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Torres*, 82 Conn. App. 823, 825–27, 847 A.2d 1022, cert. denied, 270 Conn. 909, 853 A.2d 525 (2004).

With these principles in mind, and construing the evidence in the light most favorable to sustaining the verdict, we determine that the jury reasonably could have concluded that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt as to each count.

A

Count One—Robbery in the First Degree

The defendant first argues that there was insufficient evidence to support his conviction of robbery in the first degree in violation of § 53a-134 (a) (3).[2] Specifically, the defendant argues that the evidence did not sufficiently establish that he used a hypodermic syringe to stab Jalbert and that, under the circumstances, the hypodermic syringe was not a dangerous instrument.[3] We disagree.

1

The following additional facts are relevant to the defendant's claim that there was insufficient evidence to prove that he used a hypodermic syringe to injure Jalbert. While at Saint Francis Hospital and Medical Center, Karen Bigge, a physician assistant, treated Jalbert. She testified to seeing "some superficial scratches and what appeared to be some puncture wounds" to Jalbert's left arm, which were consistent with having been stabbed with a hypodermic syringe. Jalbert's medical records were admitted into evidence and corroborated Bigge's testimony.

In addition to Bigge's testimony, the court admitted into evidence two video exhibits without objection from the defendant. The first video exhibit showed footage

from the Save-A-Lot surveillance system. As the jury viewed the video, Jalbert testified to the events taking place. The video showed the defendant exiting the store with Jalbert in pursuit. The jury could see that once outside the store, Jalbert attempted to apprehend the defendant. Jalbert identified for the jury the moment when he was stabbed with the hypodermic syringe.

As to the second video exhibit, Jalbert testified that the property management company, which owned the plaza where Save-A-Lot was located, operated its own security cameras. These cameras covered a sector of the parking lot that the Save-A-Lot cameras did not. Sometime after the incident, the plaza's property management company allowed Jalbert to view its surveillance monitors, and Jalbert testified to using his cell phone to film the footage displayed on the computer screen. This video showed the defendant running through the parking lot, the furniture store employee and Jalbert chasing and apprehending the defendant, and the Hartford police officers arriving on the scene. The jury also could see Jalbert pointing to his left forearm on multiple occasions while speaking with the police officers.

The evidence before the jury indicating that the defendant used a hypodermic syringe to stab Jalbert consisted of not only testimony from Jalbert, but also testimony from Bigge and Labbe, as well as two video exhibits and Jalbert's medical reports. The defendant characterizes Jalbert's testimony about when he saw the hypodermic syringe as inconsistent. The defendant also points to the inconsistent testimony between Jalbert, who testified to one puncture wound, and Bigge, who testified that she saw "what appeared to be some puncture *wounds* to [Jalbert's] arm." (Emphasis added.) The defendant argues that Bigge's use of the plural form of "wound" when combined with Jalbert's testimonial inconsistencies is enough to establish that there was insufficient evidence at trial to prove that the defendant stabbed Jalbert in the arm with a hypodermic syringe. However, "[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony." *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002). We conclude the evidence before the jury was sufficient to allow it to resolve any evidentiary inconsistencies.

Construing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have concluded that the cumulative force of the testimony of Jalbert, Bigge, and Labbe, as well as the video exhibits and Jalbert's medical records, established that the defendant used a hypodermic syringe to stab Jalbert in the arm.

The defendant also contends that the evidence was insufficient to prove that the hypodermic syringe was a dangerous instrument under the circumstances. We disagree.

The following additional facts are relevant to this claim. The hypodermic syringe was admitted into evidence as a full exhibit at trial. Jalbert testified that once the defendant was apprehended, he dropped the hypodermic syringe, and it landed approximately four feet away. To his recollection, the hypodermic syringe was uncapped and the needle portion of the hypodermic syringe was broken. Jalbert testified that he pointed out the hypodermic syringe to the police officers.

At trial, however, Hartford police Officer Steven Suchecki testified that Jalbert handed him the hypodermic syringe. During cross-examination, Suchecki could not ascertain from where Jalbert had gotten the hypodermic syringe, but he did testify that Jalbert indicated that the hypodermic syringe came from the defendant. Suchecki also testified that when he secured the hypodermic syringe at the scene, it was uncapped and the needle portion of the hypodermic syringe was bent.

The jury heard additional testimony concerning the hypodermic syringe from Gerald Kumnick, a police inspector with nearly nineteen years of experience. Kumnick testified that he and the prosecutor conducted an experiment with the same hypodermic syringe that was introduced at trial. As part of the experiment, Kumnick testified that he inflated a rubber glove, twisted the end of the glove, and held it steady so the prosecutor could stab the glove. On the first attempt, the hypodermic syringe created a small hole in the glove but did not cause it to deflate. When the prosecutor plunged the hypodermic syringe into the inflated rubber glove a second time, it "popped like a balloon would pop." Kumnick concluded that "the glove popped from the [hypodermic syringe] being poked into it."

In addition to Kumnick's testimony, the jury heard from Bigge, who testified that she examined the hypodermic syringe. In her opinion, the hypodermic syringe was capable of transmitting blood-borne pathogens. This opinion was based on observing the presence of a needle in the hypodermic syringe. Bigge also testified that blood-borne pathogens, such as HIV, hepatitis B, or hepatitis C, could be transmitted through metal or plastic from a hypodermic syringe. In the case of a person infected with hepatitis, the disease could cause abdominal pain, yellowing of the skin, and damage to organs.

The defendant argues that the hypodermic syringe was not a dangerous instrument under the circumstances. On appeal, the defendant claims that it was unclear whether the hypodermic syringe was "ever used or [brandished]" to argue that there was insufficient

evidence for a jury to conclude that the hypodermic syringe was a dangerous instrument. The defendant's argument is unavailing.

We now set forth the law that guides our analysis disposing of the defendant's claim that the hypodermic syringe was not a dangerous instrument. At the time of the defendant's arrest, the Penal Code defined, in relevant part, a dangerous instrument as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." General Statutes § 53a-3 (7). "[A]n ordinary object may be a dangerous instrument. Therefore, [e]ach case must be individually examined to determine whether, under the circumstances in which the object is used or threatened to be used, it has the potential for causing serious physical injury. . . . The question of whether in the given circumstances a particular object was used as a dangerous instrument is a question of fact for the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *McColl*, 74 Conn. App. 545, 554, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003).

"[T]he analysis focuses on the actual circumstances in which the instrument is used in order to consider the instrument's potential to cause harm. . . . The statute neither restricts the inquiry to the exact manner in which the object was actually used, nor requires any resulting serious physical injury. . . . The facts and circumstances need show only that the general way in which the object was used could potentially have resulted in serious physical injury. . . . The object's potential for injury, therefore, must be examined only in conjunction with the circumstances in which it is actually used or threatened to be used, and not merely viewed in terms of its dangerous capabilities in the abstract." (Citation omitted; internal quotation marks omitted.) *State* v. *Schultz*, 100 Conn. App. 709, 721, 921 A.2d 595, cert. denied, 282 Conn. 926, 926 A.2d 668 (2007).

Contrary to the defendant's argument, there was evidence to show that the hypodermic syringe was a dangerous instrument. For instance, Jalbert testified to hearing the defendant state that he had a hypodermic syringe, to feeling a sharp pain on his left forearm and seeing a blood mark, and to seeing the defendant running with a hypodermic syringe in his right hand. Additionally, Bigge and Labbe testified to seeing a wound on Jalbert's arm that was consistent with his having been stabbed with a hypodermic syringe. As the final arbiter of credibility of any witness, the jury was free to disbelieve Jalbert, Bigge, or Labbe. Moreover, "[o]n appeal, we cannot revisit the jury's decision to believe the witnesses." *State* v. *Robinson*, 125 Conn. App. 484, 489, 8 A.3d 1120 (2010), cert. denied, 300 Conn. 911, 12

A.3d 1006 (2011).

In addition to this testimony, the jury had the hypodermic syringe that was recovered at the scene for its evaluation. The state also produced evidence that the hypodermic syringe was able to puncture an inflated glove. Through Bigge's testimony, the jury learned that the hypodermic syringe could transmit blood-borne pathogens. Therefore, when evaluating all of the evidence before it, the jury reasonably could have concluded that being stabbed with a hypodermic syringe potentially contaminated with a blood-borne pathogen constituted a dangerous instrument.[4]

We conclude that when construing the evidence in the light most favorable to sustaining the verdict and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt as to robbery in the first degree. Accordingly, the defendant's claim must fail.

B

Count Two—Assault in the Second Degree

The defendant next claims that there was insufficient evidence to support his conviction of assault in the second degree. Specifically, the defendant contends that because his statement, "I have a needle," could have been a warning or that Jalbert's injury could have been accidental, a reasonable jury could not have concluded that he intended to cause injury. The defendant also argues that because Jalbert did not see the defendant stab him with a hypodermic syringe, as well as inconsistencies between the testimony of Jalbert and Bigge, a reasonable jury could not have concluded that he caused Jalbert's injury. We disagree.

We set forth the relevant law that disposes of the defendant's claim that the state did not provide sufficient evidence to support his conviction of assault in the second degree. At the time the defendant was arrested, § 53a-60 (a) provided, in relevant part, that "[a] person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person . . . by means of . . . a dangerous instrument other than by means of the discharge of a firearm . . . ." At the time the defendant was arrested, "physical injury" was defined as "impairment of physical condition or pain . . . ." General Statutes § 53a-3 (3).

"Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . [T]he [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circum-

stances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 114 Conn. App. 738, 744–45, 971 A.2d 63, cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009).

The jury reasonably could have found that the defendant intended to cause Jalbert physical injury through the direct and circumstantial evidence presented at trial. It is well established that "[t]here is no distinction between direct and circumstantial evidence [so] far as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Teti*, 50 Conn. App. 34, 39, 716 A.2d 931, cert. denied, 247 Conn. 921, 722 A.2d 812 (1998). The jury was able to evaluate Jalbert's credibility as he recounted the struggle with the defendant, and the jury had the opportunity to observe the altercation on the video. Therefore, the jury reasonably could have rejected the defendant's argument that his statement concerning the hypodermic syringe was a warning or that Jalbert's wound was accidental.

Likewise, the jury also reasonably could have concluded that the defendant caused Jalbert's injury. The jury heard testimonial evidence from Jalbert, Bigge, and Labbe. Also, it viewed the second video exhibit and reviewed Jalbert's medical report. Jalbert testified to hearing the defendant state that he had a hypodermic syringe, which was followed by sharp pain. Both Bigge and Labbe testified to seeing a wound consistent with being stabbed with a hypodermic syringe. Although there were inconsistencies between the testimony of Jalbert and Bigge as to the wound, the jury was free to resolve these inconsistencies in a manner consistent with a finding of guilt. See *State* v. *Meehan*, supra, 260 Conn. 381. Therefore, the jury reasonably could have credited Jalbert's testimony and concluded that the defendant caused Jalbert's injury in light of the following: (1) Bigge's physical examination and testimony; (2) testimony from two police officers attesting to having seen a puncture wound; (3) video evidence of Jalbert pointing to his arm; and (4) Jalbert's medical records. Because the jury, having considered the direct and circumstantial evidence, rejected the defendant's theories, "[his argument] is inadequate to support his sufficiency of the evidence claim." *State* v. *Johnson*, 71 Conn. App. 272, 283, 801 A.2d 890, cert. denied, 261 Conn. 939, 808

A.2d 1133 (2002), cert. denied, 537 U.S. 1207, 123 S. Ct. 1286, 154 L. Ed. 2d 1052 (2003).

We conclude that when construing the evidence in the light most favorable to sustaining the verdict and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt as to assault in the second degree. Accordingly, the defendant's claim is without merit.

## II

### IMPROPER JURY CHARGE CLAIM

The defendant next claims that the court improperly charged the jury on robbery in the first degree. Specifically, the defendant argues that the court erroneously denied his requested charge pursuant to *State* v. *Nicholson*, 71 Conn. App. 585, 591–92, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002). We are not persuaded.

The following additional facts are relevant to this claim. In anticipation of the charge conference, the defendant submitted a written request to charge. See Practice Book § 42-16. The defendant requested that the following language be incorporated into the court's charge to the jury: "The charge of robbery in the first degree requires either the actual use of a dangerous instrument, or its threatened use, *demonstrated by an actual display or words combined with an overt display of the threatened instrument.*" (Emphasis added.) The defendant cited *Nicholson* as authority for the proposed instruction. The court declined to give the charge requested by the defendant and instead charged the jury, in relevant part, as follows: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery or of immediate flight therefrom, he used or threatened the use of a dangerous instrument."

We set forth the relevant law governing the defendant's improper jury charge claim. The standard of review for claims of instructional impropriety is well established. "Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction." (Internal quotation marks omitted.) *State* v. *Kitchens,* 299 Conn. 447, 454–55, 10 A.3d 942 (2011).

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts.

. . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . ." (Internal quotation marks omitted.) *State* v. *Perry*, 108 Conn. App. 788, 792, 949 A.2d 537, cert. denied, 289 Conn. 912, 957 A.2d 881 (2008).

"The duty of the trial court [in a criminal case] is to instruct the jury on the law applicable to the case [and] . . . in charging the [members of the] jury in a criminal case, to give to them such instructions as may be required to enable them to understand the nature of the offense charged and the questions which they are to decide, to weigh the evidence applicable to such questions, and to intelligently decide them." (Citations omitted; internal quotation marks omitted.) *State* v. *St. Pierre*, 58 Conn. App. 284, 291, 752 A.2d 86, cert. denied, 254 Conn. 916, 759 A.2d 508 (2000). "The defendant is entitled to a jury which is correctly and adequately instructed." (Internal quotation marks omitted.) *State* v. *Fletcher*, 10 Conn. App. 697, 701, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988). "It is of the utmost importance that the instructions be clear and comprehensible and provide guidance to the jury in applying the law to the facts it finds established." Id., 704.

The court properly declined to give the defendant's proposed charge because the facts in this case were distinguishable from the facts in *Nicholson*. In *Nicholson*, the defendant did not show or threaten the use of a box cutter, but, by keeping his right hand in his pocket as he verbally threatened the victim, gave the victim "the impression that [the defendant] may have possessed a knife, gun or other weapon in his pocket." *State* v. *Nicholson*, supra, 71 Conn. App. 587. It was only after the defendant was arrested that a box cutter was found in his sweatshirt pocket. Id., 588. The court in *Nicholson* concluded that "[a] conviction pursuant to § 53a-134 (a) (3) cannot stand if the evidence merely shows that the defendant was armed with a dangerous instrument, or that he gave the impression by his words or conduct that he was armed with a dangerous instrument." Id., 591.

In this case, as the defendant resisted Jalbert's attempt to apprehend him, the defendant specified the type of dangerous instrument he had on his person. This factual distinction between the present case and *Nicholson* supports the court's decision to reject the defendant's written request to charge the jury. The court correctly reasoned that the jury reasonably could have concluded that "the dangerous instrument may be the syringe that the defendant indicated he had [on his person] . . . ." Therefore, the court properly rejected the defendant's requested charge to the jury.

In reviewing the jury charge as a whole, we conclude that the jury instructions correctly applied the law. The

court adopted jury instructions on the elements of robbery in the first degree in accordance with the model criminal jury instructions.[5] This court has noted that "[w]hile not dispositive of the adequacy of the [jury] instruction, an instruction's uniformity with the model instructions is a relevant and persuasive factor in our analysis." *State* v. *Sanchez*, 84 Conn. App. 583, 592 n.10, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

Moreover, the jury charge provided ample guidance. The jury was provided with the specific elements of the charge, which tracked the statutory language, as well as an explanation of each element. The court defined key terms and legal concepts, namely, "robbery," "larceny," "dangerous instrument," "serious physical injury,"and "immediate flight." The court further explained the concepts of circumstantial and direct evidence, while also pointing out that jurors may draw logical and reasonable inferences from facts established by the evidence. See *State* v. *Lo Sacco*, 11 Conn. App. 24, 29–30, 525 A.2d 977 (finding no error in jury charge when judge read statute verbatim, explained each subsection, and defined key term for jury), cert. denied, 204 Conn. 812, 528 A.2d 1158 (1987). "As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 455. We conclude that the jury charge, read in its totality, provided proper guidance and did not mislead the jury. Accordingly, the defendant's claim fails.

## III

### EVIDENTIARY CLAIMS

Finally, the defendant claims that the court abused its discretion by limiting his cross-examination of Jalbert and that this evidentiary ruling was harmful error.[6] Specifically, the defendant claims that the court (1) improperly sustained the state's objections to defense counsel's line of questioning as to who paid Jalbert's medical expenses and as to whether he had filed a workers' compensation claim, and (2) improperly limited cross-examination exploring Jalbert's motivation in recording the video of the incident and his laughter during the recording. The defendant argues that these topics were relevant because they tended to show that Jalbert lacked credibility, that he was seeking compensation for the incident, and that Jalbert harbored bias against the defendant.[7] The state counters that the defendant failed to establish that the testimony was relevant. We agree with the state and conclude that the court did not abuse its discretion in sustaining the state's objections.

The following additional facts are necessary to address this claim. At trial, the defendant attempted to

elicit testimony from Jalbert on cross-examination as to who paid his medical expenses and whether he submitted a workers' compensation claim. The state objected to the questions, and the court sustained the state's objections on the ground that the information sought was irrelevant.[8] Afterward, defense counsel cross-examined Jalbert on the video he had recorded using his cell phone, which previously was admitted into evidence as a full exhibit. When defense counsel attempted to ask Jalbert about his intentions in making the recording, the state objected to the question on relevance grounds, and the court excused the jury.

In the colloquy that followed, defense counsel argued that her line of questioning was meant to elicit relevant testimony from Jalbert as to his motivation for taking the video. Defense counsel stated that she "[believed] that [Jalbert's reason for recording the video] was to [get] compensation for [the] incident," which tended to show that Jalbert had "interest in the outcome . . . and [went] to his credibility." Additionally, defense counsel represented to the court that she wanted to ask Jalbert whether he found any aspect of the video amusing.

The original video recording contained audio. In it, one can hear some commentary and laughter between Jalbert and another individual. However, the jury did not hear the audio portion of the video. Nevertheless, defense counsel argued that any comment or laughter from Jalbert was relevant to his credibility and tended to show bias against the defendant.

In support of her argument, defense counsel cited various cases, as well as § 6.5 of the Connecticut Code of Evidence,[9] for the proposition that "evidence intending to show a witness' bias, prejudice, or interest [was] never a collateral impeachment of a witness . . . [and] may be accomplished through the introduction of [extrinsic] evidence in addition to examining the witness correctly." After reviewing the cited references, the court sustained the state's objection, reasoning that even though cross-examination showing a motive, bias, and interest of a particular witness is never collateral, "[i]n this particular case . . . any [w]orkers' [c]ompensation action or any action to recover payments of medical bills . . . [does not] go to show bias that this witness has against this particular defendant." As to the video, the court sustained the state's objection because the recording was shown to the jury without sound, and "[what is] relevant [was] actually what happened in the tape itself . . . ."

We begin by setting forth the relevant law that guides our analysis of the defendant's claim that the court abused its discretion in certain evidentiary rulings. "The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' moti-

vation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Benedict*, 313 Conn. 494, 510, 98 A.3d 42 (2014). "[A]s a general rule cross-examination of the prosecuting witness should be allowed to show the pendency, existence and status of civil action . . . arising out of the same set of circumstances as those which served as the basis for the criminal prosecution." (Internal quotation marks omitted.) *State* v. *Reis*, 33 Conn. App. 521, 524–25, 636 A.2d 872, cert. denied, 229 Conn. 901, 640 A.2d 118 (1994). "However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." (Internal quotation marks omitted.) *State* v. *Badaracco*, 156 Conn. App. 650, 674, 114 A.3d 507 (2015).

Our Supreme Court has "emphasized in numerous decisions . . . that the confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. . . . [For example, a] defendant may elicit only relevant evidence through cross-examination. . . . The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant. . . . Relevance may be established in one of three ways. First, the proffering party can make an offer of proof. . . . Second, the record can itself be adequate to establish the relevance of the proffered testimony. . . . Third, the proffering party can establish a proper foundation for the testimony by stating a good faith belief that there is an adequate factual basis for his or her inquiry." (Citations omitted; internal quotation marks omitted.) *State* v. *Benedict*, supra, 313 Conn. 511. "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995).

At trial, the defendant made no offer of proof, and, on appeal, he relies on *State* v. *Colton*, 227 Conn. 231, 630 A.2d 577 (1993), to argue that the court abused its discretion by "ignoring any possible financial interest [Jalbert may have had] in the outcome." (Emphasis omitted.) Therefore, the defendant argues, "if the jury had been permitted to know that Jalbert was seeking financial compensation [through a workers' compensation claim] for the injury, [it] would probably have looked at his credibility differently . . . ."

The defendant's reliance on *Colton* fails for two reasons. First, our Supreme Court in *Colton* found reversible error when the trial court precluded extrinsic

evidence showing motive and bias of the state's chief witness *after* direct examination testimony provided the foundation for the defendant to attempt to impeach the witness through cross-examination. *State* v. *Colton*, supra, 227 Conn. 238–39, 247. In this case, Jalbert, on direct examination, did not testify to missing work, to filing a workers' compensation claim, or to needing assistance paying any expenses in connection with this incident. Therefore, the defendant on cross-examination did not have a foundation for the court to allow him to inquire about Jalbert's medical expenses or about a speculative workers' compensation claim. See *State* v. *Barnes*, supra, 232 Conn. 749–50 ("[i]t is entirely proper for a court to deny a request to present certain testimony that will further nothing more than a fishing expedition . . . or result in a wild goose chase" [citation omitted; internal quotation marks omitted]). Second, in *Colton*, the defendant made several offers of proof to establish that the proffered evidence, although extrinsic, impeached the witness' testimony. *State* v. *Colton*, supra, 242–45. The defendant in this case made no offer of proof showing that Jalbert was attempting to benefit financially. Upon the state's objection to questions pertaining to medical expenses and a workers' compensation claim, the defendant made no offer of proof as to what evidence he expected to elicit from Jalbert; rather, in his effort to argue for the relevancy of the matter, the defendant merely stated that he wanted to "show *whether* they initially refused [a workers' compensation claim] because [Jalbert's actions were] outside the scope of his employment." (Emphasis added.) The defendant's speculative inquiry into whether Jalbert filed a workers' compensation claim cannot be considered an offer of proof.[10] See *State* v. *Conrod*, 198 Conn. 592, 597, 504 A.2d 494 (1986) ("An offer of proof, properly presented, serves three purposes. First, it should inform the court of the legal theory under which the offered evidence is admissible. Second, it should inform the trial judge of the specific nature of the offered evidence so the court can judge its admissibility. Third, it thereby creates a record adequate for appellate review." [Internal quotation marks omitted.]), quoting *Mad River Orchard Co*. v. *Krack Corp*., 89 Wn. 2d 535, 537, 573 P.2d 796 (1978).

Moreover, the record is devoid of any concrete evidence that would have allowed the court to conclude that the proffered testimony concerning payment of Jalbert's medical expenses or a speculative workers' compensation claim was relevant. The defendant relies on *State* v. *Chance*, 236 Conn. 31, 671 A.2d 323 (1996), for the proposition that "cross-examination to elicit facts tending to show that a witness' testimony was motivated by bias may not be unduly restricted." In that case, the trial court properly allowed the state to impeach a defense witness because the elicited direct examination testimony provided the proper foundation

to cross-examine the witness on bias. Id., 57, 59. In this case, however, Jalbert's testimony during direct examination did not provide a basis for the defendant to cross-examine Jalbert on medical expenses or a speculative workers' compensation claim. Jalbert did not testify that he owed money for having received medical care, did not mention that he missed work because of the injury, and did not state that he was seeking to file a workers' compensation claim. Jalbert did testify to having gone to the hospital via ambulance, but that alone was insufficient to establish an independent basis in the record demonstrating how the proffered testimony would have shown witness bias or an interest in the outcome of the case. See *State* v. *Santiago*, 224 Conn. 325, 332, 618 A.2d 32 (1992) (concluding that there was specific evidence in record to adequately establish relevance of proffered testimony concerning relationship between state's witness and police department in attempt to prove witness bias).

For similar reasons, we conclude that the defendant failed to provide a good faith belief that there was an adequate factual predicate to cross-examine Jalbert on whether someone had paid his medical bills or whether he had filed a workers' compensation claim. On appeal, the defendant relies on *State* v. *Arline*, 223 Conn. 52, 612 A.2d 755 (1992), to argue that he should have been "permitted to elicit facts on cross-examination as to whether Jalbert had a pending civil claim arising out of the same incident giving rise to the criminal prosecution . . . ." The defendant's reliance on *Arline* is misplaced. In that case, our Supreme Court held that "[o]nce testimony regarding subsequent criminal charges against the complainant and the existence of a civil claim *had been admitted into evidence* . . . the defendant had a right to argue in final argument any reasonable inferences from the facts elicited." (Emphasis added.) *State* v. *Arline*, supra, 59. In this case, the issue concerns limiting cross-examination and not a closing argument, but more importantly, nothing regarding Jalbert's medical expenses or a workers' compensation claim had been admitted into evidence. To be fair, the court in *Arline* did state that it is "*generally* accepted that the pendency of a civil claim arising out of the same set of circumstances as those that served as the basis for a criminal prosecution is probative of a prosecuting witness' motive to lie because the outcome of the prosecution may be beneficial to the prosecuting witness." (Emphasis added.) Id., 61. Because there was no evidence as to medical expenses or a workers' compensation claim, and the defendant failed to articulate how Jalbert could have benefited financially from the outcome of the case, the court could not apply the general rule as stated in *Arline*. Our review of the transcript reveals that the defendant neither established a proper foundation for the proffered testimony nor stated a good faith belief that Jalbert had a financial interest in

the outcome of the case. See *State* v. *Benedict*, supra, 313 Conn. 511.

The defendant's argument that the court improperly prevented cross-examination of Jalbert on the audio portion of the second video exhibit also fails. Although the defendant "believed that [Jalbert recorded the video to receive] . . . compensation for this incident," he offered no proof nor stated a good faith belief for this assertion. See *State* v. *Henry*, 72 Conn. App. 640, 666–67, 805 A.2d 823 (concluding that court did not abuse discretion in disallowing proposed cross-examination because defense counsel's statement, " 'I know that he was arrested on this witness' statement,' " did not provide substantive information and lacked good faith belief), cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002). A thorough review of the record does not reveal how the proffered testimony would have been relevant or supported the defendant's stand-alone belief that Jalbert recorded the video for his financial interest. In addition, the defendant failed to articulate any logical connection between Jalbert's comments or laughter on the video (not heard by the jury) and the fact that he claims that such evidence tends to show that Jalbert lacked credibility or was biased against the defendant. The court reasonably could have concluded that the jury's attention to the vital issues of the case could have been distracted by cross-examination seeking information as to who, if anyone, paid Jalbert's medical bill, inquiring as to whether Jalbert filed a workers' compensation claim, and eliciting testimony into Jalbert's motives for recording the video and whether he found it amusing. See *State* v. *Isabelle*, 107 Conn. App. 597, 607, 946 A.2d 266 (2008) ("[i]t is a reasonable exercise of judicial discretion to exclude . . . evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case" [internal quotation marks omitted]).

The record in this case establishes that the court did not abuse its discretion in sustaining the state's objection to the proposed cross-examination. Moreover, even if the court had erred as claimed by the defendant, any error was harmless.[11] Accordingly, the defendant's evidentiary claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In the context of this case and for clarity, all subsequent "needle" references are identified as "hypodermic syringe." See Stedman's Medical Dictionary (27th Ed. 2000) p. 1774 (defining "hypodermic syringe" as a "small [syringe] with a barrel . . . perfectly matched plunger, and tip [that is] used with a hollow needle for subcutaneous injections").

[2] General Statutes § 53a-134 (a) provides in relevant part that "[a] person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[3] Because we conclude that the jury reasonably could have found that

the defendant used the hypodermic syringe and that it was a dangerous instrument, we do not need to reach the defendant's claim that the evidence did not sufficiently establish that he threatened Jalbert with a dangerous instrument.

[4] Courts in other jurisdictions have concluded that a hypodermic syringe can be a dangerous instrument. See *State* v. *Ainis*, 317 N.J. Super. 127, 131–34, 721 A.2d 329 (Law Div. 1998) (holding that hypodermic syringe purportedly infected with AIDS virus was "deadly weapon" under N.J. Stat. § 2C:43-7.2); *People* v. *Nelson*, 215 App. Div. 2d 782, 783, 627 N.Y.S.2d 412 (1995) (holding that hypodermic syringe purportedly infected with AIDS virus constituted "dangerous instrument" within meaning of New York Penal Law § 10.00 [13] even though prosecution did not prove needle portion of hypodermic syringe was infected with virus).

[5] The court followed § 6.4-1 of the Criminal Jury Instructions. See Connecticut Criminal Jury Instructions (Rev. to May 10, 2012) § 6.4-1, available at http://www.jud.ct.gov/JI/criminal/part6/6.4-1.htm (last visited November 3, 2015). We note that the jury instructions used by the court during the defendant's trial have not changed in relevant part from the current revision.

[6] We note that the defendant does not claim that the court's ruling violated his constitutional right to cross-examine Jalbert.

[7] For the first time on appeal, the defendant advances other theories concerning Jalbert's alleged bias and self-interest in the outcome of the case that were not presented at trial. For example, the defendant contends that Jalbert was biased against store customers in general and was "portraying himself as a victim to get compensation from the state victim's fund." We do not address these claims. See *State* v. *Russell*, 67 Conn. App. 822, 826–27, 789 A.2d 1088 ("We have consistently refused to consider evidentiary rulings not properly preserved. Where the issue raised for the first time on appeal is a matter of state evidentiary law . . . this court will deny the defendant appellate review." [Internal quotation marks omitted.]), cert. denied, 260 Conn. 901, 793 A.2d 1090 (2002).

[8] The line of questioning at trial was as follows:

"[Defense Counsel]: Now, did Brownard Security pay your bills?

"[Jalbert]: Pay my bills?

"[Defense Counsel]: Yes.

"[Jalbert]: As in my—

"[Defense Counsel]: Well, you had an ambulance bill and you must have incurred medical bills?

"[The Prosecutor]: Objection, relevance.

"The Court: How is this relevant?

"[Defense Counsel]: Your Honor, I would claim it to show whether they initially refused because it was outside the scope of his employment.

"The Court: Sustain. . . .

"[Defense Counsel]: Did you file a [workers' compensation] claim?

"[The Prosecutor]: Objection, relevance.

"The Court: Sustain.

"[Defense Counsel]: Exception on that ruling, Your Honor.

"The Court: Well, you don't have to, but you—okay. Thank you. Noted.

"[Defense Counsel]: Has anybody paid for your hospital bill?

"[The Prosecutor]: Objection, relevance.

"The Court: Sustain."

[9] Section 6.5 of the Connecticut Code of Evidence provides: "The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely."

[10] We also reject the defendant's claim made during oral argument before this court that the trial court has a sua sponte responsibility to solicit an offer of proof. "We never have held that a trial court has an independent obligation to order, sua sponte, a hearing on an evidentiary matter, in the absence of both a request for a hearing and an adequate offer of proof." (Emphasis omitted; internal quotation marks omitted.) *State* v. *LaVoie*, 158 Conn. App. 256, 268, 118 A.3d 708 (quoting *State* v. *Sullivan*, 244 Conn. 640, 651 n.14, 712 A.2d 919 [1998]), cert. denied, 319 Conn. 929,       A.3d       (2015).

[11] "We . . . note that the defendant [bears] the burden of establishing harm from any evidentiary error. A defendant is not entitled to appellate relief on the basis of an erroneous evidentiary ruling, however, without demonstrating that the ruling was harmful to him in that it affected the verdict. When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a

fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Badaracco*, supra, 156 Conn. App. 674–75.

Even if we were to assume that the court improperly limited the defendant's cross-examination of Jalbert, we conclude that any error was harmless. Although Jalbert was the key witness, the state presented ample corroborating testimonial, video, and physical evidence to support a finding a guilt beyond a reasonable doubt. Therefore, the defendant failed to meet his burden, and the record does not show that the court's alleged nonconstitutional evidentiary ruling substantially affected the verdict.